[Civ. No. 4933. Fourth Dist. Apr. 5, 1955.]

JOSEPH B. MASHBURN, Appellant, v. BOARD OF FUNERAL DIRECTORS AND EMBALMERS et al., Respondents.

Claude L. Rowe and Chalmers E. Lones for Appellant.

Edmund G. Brown, Attorney General, and Willard A. Shank, Deputy Attorney General, for Respondents.

GRIFFIN, J.—Plaintiff, a funeral director in Madera and Chowchilla, was accused in two counts of an accusation of violating section 7694 of the Business and Professions Code. The second count charged that on April 19, 1953, he solicited from a Mrs. Miller the human dead body of her husband, after his death, and did solicit from her the funeral directing

and embalming business incident to and connected with the disposition of his dead body.

In a third count it is charged that on December 19, 1952, he solicited from a Mrs. O'Neal her husband's dead body, and likewise solicited from her the funeral directing and embalming business. The Board of Funeral Directors and Embalmers (hereinafter referred to as the board) found these two counts to be true and suspended his funeral director's license for a period of 90 days, with certain conditions attached. On a review of that board's judgment by the trial court it, in the light of the whole record, under section 1094.5 of the Code of Civil Procedure, sustained the board's finding and denied the writ. The only issue here raised or involved is the claim that there was not sufficient evidence before the board or the trial court to support the findings.

Section 7694, *supra,* provides that "Solicitation, after a death or while a death is impending, of funeral directing or embalming business by the licensee, . . . constitutes a ground for disciplinary action . . ." It is plaintiff's claim that this section only prohibits solicitation of funeral directing and embalming business; that therefore the charge of soliciting bodies should not be considered; and that plaintiff's conduct in neither case comes within the definition of "solicitation."

The board held hearings in Madera and Long Beach. Some of the evidence is in sharp conflict, and a careful examination of the voluminous transcript, both at those hearings and in the trial court was necessary to properly view the overall picture.

Plaintiff and appellant Joseph B. Mashburn, doing business as Madera Funeral Home in Madera, and as The Chowchilla Funeral Chapel in Chowchilla, also had some working agreement with the county to operate a 24-hour ambulance service for accidents, etc., occurring in that county. His competitor, the county coroner, also maintained similarly located funeral parlors and apparently there was considerable feeling between them. It was the practice to take all accidental death cases to the coroner and he would embalm the bodies and if another funeral director secured the body from him he would make a charge for the embalming service. Although a signed order from the nearest of kin of a deceased, authorizing delivery of the body to Mashburn was required by the coroner, this same rule was not altogether applied to other funeral directors. With this background, we will pro-

ceed to set forth a résumé of the evidence tending to support the respective charges.

## THE MILLER CASE

Tharold Miller was involved in an automobile accident at approximately 8 p. m. on December 19, 1952, on United States Highway 99, south of Madera. Appellant arrived in his ambulance shortly thereafter, assisted in extracating Miller from the wreckage, and drove him to the Dearborn Hospital in Madera, arriving approximately at 9 p. m. that evening. There is some evidence indicating that he may have been dead at the time he was first placed in the ambulance. The doctor, when he arrived at the hospital at approximately 9:15, pronounced him dead. Appellant placed a call to the wife of the deceased, Mrs. Miller, at 9:20 p. m., at the family residence in Fresno, and informed her, according to Mrs. Miller's story, that her husband had been involved in a serious accident, but he did not indicate to her that he was dead. When Mrs. Miller asked whether she should come to the hospital appellant suggested that she do so and offered to send a car to get her, which she declined. Mrs. Miller was driven to the hospital and arrived at approximately 10:20 p. m. She was informed by the doctor of her husband's death. Appellant, who was still at the hospital, then consoled Mrs. Miller and informed her that he needed certain information for the death certificate and suggested that she follow him to his office. She did so, and when they arrived at the Madera Funeral Home, a short distance from the hospital, Mrs. Miller was met by appellant and his wife. Appellant, according to Mrs. Miller's testimony, then asked her if she had any preference as to who should handle the funeral arrangements and services and she said: "Yes, the Lisle Funeral Home in Fresno." Appellant then stated he would contact Mr. Lisle and take the burden off her shoulders. He then handed Mrs. Miller a document, which she signed, and informed her it was a routine procedure. The document proved to be an order for release of the body of Mr. Miller from the coroner of Madera County to the Madera Funeral Home, owned by appellant. Mrs. Miller testified that she signed the release without reading it as her eyes were full of tears. Appellant then told her that he would contact her in the morning and Mrs. Miller departed for Fresno. On the morning of December 20, about 9:30, appellant called at the Miller residence in Fresno. He assisted her in selecting the clothes for Mr. Miller to wear

in the casket, assisted her in selecting a casket in Fresno, and also accompanied her to the cemetery where a plot was selected. They then returned to the Miller residence. While at the cemetery appellant placed a telephone call to the Lisle Funeral Home and arranged for the use of the Lisle Chapel for the purpose of leaving the deceased there until the graveside service. Appellant left the Miller residence immediately after that. Mrs. Miller then inquired of her family whether Mr. Lisle had called to see them because he was a friend of the family and she believed that Mr. Lisle was handling the funeral arrangements. Due to this anxiety a friend of Mrs. Miller contacted Mr. Lisle, who came to the Miller home and informed her that appellant was a funeral director and that he had contacted Lisle for the first time from the cemetery just a few minutes before. Mrs. Miller testified this was the first time since her husband's death that she fully comprehended appellant was a funeral director and was in fact handling her husband's funeral. The Lisle Funeral Home was asked by Mrs. Miller to take charge of the funeral and obtain the body. This was accomplished with some bitterness between Mr. Lisle and the appellant. At about 5:30 that afternoon appellant dispatched a telegram to Mrs. Miller informing her of his charges for services in the sum of $935.

Appellant's testimony is that Miller was still alive when he reached the hospital; that he, according to custom, immediately telephoned Mrs. Miller while he was at the hospital; that he told her of the accident and of the fact that he was critically injured, and asked her to come to the hospital. He told her that if she had no transportation he would see that someone brought her there immediately; that he was Mr. Mashburn, owner of the Madera Funeral Home and the Madera Ambulance Service which brought him to the hospital; that he did not know at that time that Miller was dead; that he remained at the hospital, helping the nurses with three other people who were injured in the same accident; that when Mrs. Miller arrived the doctor informed her that he had pronounced Mr. Miller dead at 9:15 p. m. It appears that Mrs. Miller was quite indignant because she believed appellant misrepresented the facts to her and that Mr. Miller was dead when he called, and that this caused her to unnecessarily go to Madera where appellant could confront her with an order to turn the body over to him since it was required that the coroner take charge of the body after his

death. He claims that he explained to her that he operated an undertaking establishment as well as an ambulance service, and took her to his funeral office, indicated by signs thereon, and that he fully explained to her the purpose of the release and that she voluntarily signed it; that she did thereafter remark about the Lisle Undertaking Establishment, but this was only in response to his inquiry as to what funeral parlor in Fresno she desired to have the "services held," and that he said he could arrange that; that he obtained the body from the coroner upon the signed order; that the next morning he made all the necessary arrangements in Fresno, as related by Mrs. Miller, charged the casket to his funeral parlor, and assumed the liability for the plot; and that Mrs. Miller well knew all of these facts. Appellant produced witnesses who testified that appellant made no statements in their presence indicating that he was using any coercion or was soliciting from Mrs. Miller the funeral services of her husband. Appellant refused to release the body to Lisle, upon a new order signed by Mrs. Miller, unless Lisle also took the casket selected, in which the body was then contained. The body was subsequently taken to Fresno. The casket selected was not used, but one that cost less money was substituted by Lisle and Mrs. Miller, and the funeral was conducted by the Lisle Funeral Home.

## The O'Neal Case

William C. O'Neal, machinist's mate in the Navy, died in an automobile accident occurring about 7 a. m. December 19, 1952, on United States Highway 99, on the outskirts of Chowchilla. The deputy coroner was summoned to the scene, and after the body had been removed from the wreckage, about four hours later, the remains were taken to the coroner's funeral parlor in Chowchilla by a deputy. He notified a naval officer at the naval station in Treasure Island of the death of O'Neal and attempted to contact Mrs. O'Neal in Long Beach. He reached her about 2 p. m. on that day at a neighbor's house since there was no telephone in her residence. He informed her of the death of her husband, and since she could not continue the conversation in the face of this news, her neighbor took over the telephone. The deputy coroner informed her that the body was in the coroner's funeral home and requested her to have Mrs. O'Neal call him with instructions as to what she desired concerning the disposition of the remains of her husband. It appears that about 11 a. m. of that day, appellant received information

of the accident in which O'Neal was killed, and of his naval status and the telephone number of his uncle in Gardena. About 2 p. m. appellant called the naval station in San Francisco and talked to an officer on duty. He stated that he had possession of the body of O'Neal and wanted permission to take charge and complete the necessary funeral arrangements. He was informed that such authority must come from the medical department. About that time, possibly before the Navy call (the continuity of the time of the various calls is in conflict) appellant called the uncle and informed him of the accident and stated that he had possession of the O'Neal body and wanted authorization from the widow to proceed with its care. The uncle volunteered to call the widow and give her the information. He did so but she had already been informed of his death by the deputy coroner, who did have actual possession of the body and who requested her to come to Madera. Appellant then placed a call to the widow and informed her he had a funeral home in Madera; that the body was badly mutilated because he was there at the scene and helped, for four hours, to extricate it from the wreckage and that he was prepared to fix up the scars on the face and the body so the casket could be left open for their inspection. He had been in touch with the Navy, but he did not ask her for any written authority for the possession of the body at that time. Mrs. O'Neal testified she thought, at that time, she was talking to the same funeral home the deputy coroner represented.

Appellant again talked to the medical officer at the naval station and in this conversation, which took place about 4 p. m. on the afternoon of the 19th, appellant informed the lieutenant that the body of O'Neal was in the possession of the deputy coroner of Madera County and that he, appellant, had permission of the widow to take care of the funeral arrangements. Appellant was informed that he should do nothing concerning the remains until Mrs. O'Neal had been notified. Appellant stated that Mrs. O'Neal had already been notified. Immediately thereafter appellant placed another call to Mrs. O'Neal. This call was taken by Dorothy O'Neal, a sister-in-law, upon the request of the widow. Dorothy then had a conversation with appellant during which appellant stated he had the body of the deceased; that he could fix up the face of the body so that it could be recognized; that he had gotten in touch with the Navy and they had given him full permission to handle the funeral; and

that he needed a telegram from the widow to handle the funeral arrangements. Appellant then dictated to Dorothy the telegram he desired sent to him and Dorothy replied that she would inform the widow of the necessity for the telegram. This she did and she was instructed to send the telegram authorizing appellant to handle the body. It was received about 4:03 p. m. by appellant. Upon receipt of the telegram appellant telephoned the deputy coroner informing him that he had a telegram authorizing appellant to handle the body of Mr. O'Neal. The deputy coroner immediately telephoned the widow to find out why appellant had such a telegram and Mrs. O'Neal, when informed by the deputy coroner of this fact, expressed surprise and stated she thought she had sent the telegram to the deputy coroner. She then informed the deputy coroner to ignore the telegram to appellant and wait until someone came from the Navy to investigate the matter. About this time appellant placed another call to the Navy and inquired as to when the investigator would arrive and was informed that they did not know. That evening appellant telephoned Mrs. O'Neal and inquired, through Dorothy, as to the choice of a casket. In that conversation appellant told her that the uncle, Mr. Tippin, in a previous telephone conversation with him, had authorized him to handle the body. This statement was questioned by Dorothy. Mr. Tippin's wife happened to be present and took the telephone and asked appellant why he said that, because she knew her husband had not so authorized him, and appellant then retracted his statement and said if the coroner kept the body he would seal the casket but that if appellant could have it he could fix it up so the casket could be opened and the body viewed. Mrs. Tippin hung up the telephone. The following day appellant received a telegram from the Navy authorizing appellant to take charge of the body, and ordered it sent to the Martel Chapel in Long Beach, as desired by the widow. Appellant presented an itemized bill to the widow for his claimed services, which exceeded $795.

Appellant's version of the affair is somewhat different. He claims his men received a call in reference to the accident and went to the scene; that Mr. O'Neal was pinned in the car; that the deputy coroner was there and took the body to his funeral parlor in Chowchilla; that an officer called appellant and told him of a card in the effects of the deceased listing Mr. Tippin as the one to call in case of an accident; that he called and told him of the accident and told him he

owned the Chowchilla Funeral Home; that the body was at the coroner's chapel in Chowchilla and asked the widow to call him; that the widow called him and he told her the same thing; that she requested the body prepared and shipped to the Martel Chapel in Long Beach; that he told her to wire authority to take charge of the remains and she sent such a telegram; that she told him to notify the Navy Department which he did do; and that Mrs. O'Neal sent a wire of authorization as dictated by him; that he presented it to the coroner who had just started the embalming; that appellant told him he would complete it in his establishment; that when appellant's agent arrived to obtain the body, the coroner refused to release it after the coroner had talked to Mrs. O'Neal because she ordered him not to do so until the Navy approved; that appellant called the Navy Department and they authorized appellant to receive the body and ship it to Long Beach; that it was released to appellant; that Mrs. O'Neal subsequently called appellant's office and agreed to accept a $795 casket and apply the Navy allowance of $300 on it; and that he shipped the remains according to the instructions.

Upon this conflicting evidence the board found as true the allegations in the two counts indicated, and not true of the first count charging appellant with misrepresentation and fraud in the conduct of the business or the profession under section 7692 of the Business and Professions Code.

It is contended that section 7694, *supra,* does not mention the act of soliciting the *human dead body* as constituting grounds for disciplinary action but only mentions the act of soliciting, after a death or while a death is impending, of *funeral directing or embalming business,* and accordingly the only question to consider is whether or not plaintiff violated the provisions of the section. We will limit our consideration of the evidence to the provisions of the section as charged, i. e., the act of soliciting funeral directing or embalming business. In viewing the evidence in this nature of a proceeding, we are bound by the general rules applicable to civil cases, i. e., that it is the province of the appellate court to view the evidence in the light most favorable to the respondent and to sustain the findings of the trial court if there is substantial evidence in the record of the proceedings before it (which included the proceedings before the Board of Funeral Directors and Embalmers) to support them. (*Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301 [196 P.2d 20].)

Appellant relies upon *Aetna Bldg. Maintenance Co., Inc.* v. *West*, 39 Cal.2d 198 [246 P.2d 11], holding that the term "solicit" implies personal petition and importunity addressed to a particular individual to do some particular thing.

As applied to the Miller case assuming, as we must, the truth of the testimony supporting the findings, it appears that appellant did obtain funeral directing or business upon which he placed a value of $935. He contends that nowhere in his conduct is there any evidence that he solicited any of that business from the widow. He arrived at the scene of the accident in his ambulance, carried the body back to the hospital and at that time, knowing of Miller's death or impending death, called the widow and told her to come to the hospital. He remained there over one hour awaiting her arrival. While consulting her he suggested that they go to his office for the purpose of filling out the death certificate. There is no satisfactory reason shown why this could not have been done at the hospital or even without the necessity of the widow being present. The reasons for going to his office were more or less quite obvious. He was successful in obtaining her signature to a release of her husband's body to appellant's funeral home where he was to perform certain funeral services or directing business. In her grief, as claimed by her, she signed this release not knowing its characteristics or effect. It was said in *Drummey* v. *State Board of Funeral Directors & Embalmers*, 13 Cal.2d 75, at 79-80 [87 P.2d 848], that the "obvious purpose of the section is to prevent embalmers and undertakers from taking unfair advantage of their patrons at a time when such patrons are in no condition to withstand pressure." (See also *Daggett* v. *State Board of Funeral Directors & Embalmers*, 44 Cal.App. 2d 742 [112 P.2d 956].) Appellant, then, in the face of the widow's specifically stated request that the Lisle Funeral Home of Fresno handle the funeral and burial arrangements, took advantage of her confusion and bereavement to conduct the funeral and burial arrangements himself. The only concession appellant made to the widow's request was to obtain the Lisle Chapel on his own behalf for a place to keep the body preliminary to burial, and for possible burial services. One-half hour or less after the widow was informed of her husband's tragic death, appellant had obtained her signature to an order of release which she stated she could not read because her eyes were full of tears. Appellant contends that his conduct and his business status as a funeral director

were so obvious that even a woman in the complete throes of grief could not mistake his identity or his intentions. That she did make this mistake, which she later attempted to rectify, would only indicate the depth of her confusion and the studied effort of appellant to obtain and retain the business. There is sufficient evidence to support this charge.

In the O'Neal case, likewise assuming the evidence against appellant to be true, as we must, appellant did not visit the scene of the accident although he represented to several people that he did. He did not have possession of the body although he stated on at least two occasions that he did. His contention is that in all cases where his ambulance is involved, whether or not it carries the injured or dead to the hospital or mortuary, he makes it a practice to notify the surviving kin of the death of their loved ones. In this case he did not use his ambulance in returning the body and did not have it in his possession. He called the uncle of the deceased and asked whether he could take care of the body of Mr. O'Neal but was referred to the widow. He then called the naval station where the deceased was based and inquired concerning the care of the body. He made these calls from his funeral home in Madera while the body was in the funeral home of the deputy coroner in Chowchilla, a body which he had never seen. He represented to the widow that he could prepare the body so that the casket could be left open, whereas the deputy coroner who had possession of the body stated that it could not be done. Appellant contacted the widow a half hour after she had obtained knowledge of her husband's death, and as in the Miller case, benefited from the confusion extant at the time. The widow did not distinguish between his separate identity as a funeral director and that of the deputy coroner who had possession of the body. The instant case goes far beyond the contentions of appellant that he, for many years, as a matter of accommodation, has been notifying families of the death or injuries to their members in accidents where his ambulance is involved. The record, considered as a whole, clearly indicates that there is sufficient evidence to justify the board, as well as the trial court, in finding that defendant violated section 7694, *supra.*

Solicitation violative of that section need not consist of a direct request for funeral business. It is sufficient that all of the facts and circumstances surrounding the obtaining of such business indicate an overzealous attempt by a funeral director to press his services upon the bereaved before the

first shock of disaster has been bridged. The inability to make rational and reasonable decisions within a matter of minutes, or even hours after news of death, requires the protection afforded by that section. Mrs. O'Neal's testimony reflects exactly the circumstances which that section seeks to eliminate. Ordinarily, emotional upsets react precisely as did Mrs. O'Neal when confronted with the reality of her husband's death. A summarization of the evidence by the learned trial judge is quite apropos. He said:

"Respecting the question of solicitation of funeral business, charged in the second and third counts, we interpret the legislative prohibition to mean that the licensee funeral director shall not, by active word or deed, entice, importune, allure, excite or ask for the funeral or embalming business respecting the body of a deceased person. The reason for this prohibition is clearly to protect those in the throes of deep grief at the loss of a loved one from being led unwittingly into commitments which they would not have entered into except for their grief and consequent inability to clearly follow an ordinary business transaction. . . . Each time we have read and rechecked the evidence we have become more convinced that the sum total points to this conclusion, even though isolated portions of the evidence, when read alone, may give little hint of the total effect of all the evidence. We conclude, therefore, that the Board's action was fully supported by the evidence, and we are satisfied that its conclusion is correct."

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.