[Civ. No. 2898.    Fourth Dist.    Aug. 8, 1944.]

ANGELO J. COSTA, Respondent, v. JOE MAGGIO, Appellant.

Whitelaw & Whitelaw and Henry O. Wackerbarth for Appellant.

Harry W. Horton for Respondent.

GRIFFIN, J.—This is an action for termination of partnership and for accounting. In August, 1941, plaintiff and respondent discussed with defendant ·and appellant the matter of transacting business in jointly buying and selling certain lettuce and carrot crops in Imperial Valley. As defendant expressed it: ''We go out and buy certain patches and we joint. We are supposed to put up so much money apiece and joint them, pack them and split the profits.'' To furnish the necessary funds to carry out this enterprise plaintiff Costa,

on January 7, 1942, delivered to defendant Maggio, $3,200, which amount was, according to agreement, to be placed in Maggio's private bank account at Holtville. On January 7, 1942, Maggio had $596.83 in his private account. He deposited an additional $900 and also deposited plaintiff's $3,200. Maggio was an experienced buyer and had partnership deals with persons other than plaintiff. He had conducted a packing business and owned sheds and machinery used in connection therewith. As of April 1, 1942, there had been ten patches of carrots and two of lettuce purchased by the partnership. Five patches of carrots and two of lettuce had been harvested. On March 16, 1942, carrots from the "Watanabe Ranch" were purchased and on May 6th-14th, 1942, were sold at a net profit of $4,446.71. According to the audit of a referee appointed by the trial court the gross sales by the partnership during the several months of the partnership enterprise were $159,949.12. The operating expenses were $124,422.62. The net profit was $35,526.50.

The main dispute here presented is whether the "Watanabe Ranch" deal was a partnership deal in which plaintiff and defendant were entitled to participate in the profit, or whether it was a private deal of defendant Maggio and should not have been included in the partnership accounting.

On January 12, 1942, and thereafter, Maggio executed certain chattel mortgages and notes to one Sam Andrews. They were executed to secure advancements made by Andrews to carry on and conduct the packing business, pay expenses, labor in digging carrots and transporting same. These loans approximated several thousands of dollars. The notes and mortgages were signed by Maggio personally. In addition to the partnership patches of carrots the mortgage also covered two patches of carrots (115 acres) in which Maggio personally had a one-half interest. On January 7, 1942, Maggio deposited $2,250 additional in his bank account. All monies received from the sale of the carrots and lettuce were deposited in Maggio's bank account. All expenses were paid from that account. Costa spent a considerable part of his time in harvesting and looking after the patches of carrots which Maggio had purchased. On February 23, 1942, Costa asked Maggio for and received $200. On March 7, 1942, an additional $300 was paid. Later, on March 18, 1942, Maggio advanced Costa, at his request, $2,700, and on April 1, 1942, $3,900. The $2,700 was to be used by Costa in some claimed personal cherry deal

in Northern California. Costa was to go north and negotiate his cherry transaction. A few days before the cherry deal was mentioned, Maggio had purchased the "Watanabe Patch." Maggio claims that before he would pay Costa the $2,700 above mentioned, Costa agreed to release all of his interest in the "Watanabe Patch" to Maggio unless Costa returned soon and replaced the sum so drawn to the credit of the partnership venture. Costa left, but in a few days returned to the valley and continued looking after the harvesting of carrots which were purchased by Maggio under their joint venture agreement. Costa went to the "Watanabe Patch" and found that Maggio had had a disagreement with the pickers who had walked off of the ranch. Through the efforts of Costa the harvesting continued and the crop was spared, resulting in a net profit of $4,446.71.

It appears from Maggio's testimony that the reason the profits on the "Watanabe carrots" were to be excluded from the partnership accounting is because Costa violated his agreement and did not return the $2,700 to the bank account of Maggio, but placed it in a personal account of Costa in the same bank. The evidence shows that the net profits from all partnership transactions as of April 1, 1942, were in excess of $20,000. No demand was made on Costa to return the amount of $2,700 to Maggio's bank account. No impairment of working capital was shown by failure of Costa to return the $2,700 to the particular account suggested. Maggio admitted that the only reason he desired the return of the $2,700 to the partnership account was to cover the possible loss of partnership operations. The evidence fully supports the trial court's finding that the profits from the "Watanabe Patch" were a part of the assets of the partnership and that there was no breach of agreement on the part of plaintiff.

The trial court found that the mortgage and notes were repaid from the profits of the partnership; that after all debts and expenses were paid there remained a net profit of $35,526.50, exclusive of advances made by each of the copartners; that one-half thereof belonged to the respective parties; that $11,026.95 had been paid from the profits to plaintiff from time to time and that a balance of $6,736.30 was now owing from the partnership funds to plaintiff. Judgment was given accordingly.

In the accounting that was had it was discovered that

the partnership had paid $30 per car for "top ice" in shipping; that the purchaser repaid this amount to Maggio, but that he made no record of the return of such amounts in the partnership accounts. Maggio admitted that such practice had been indulged in but claimed an offset of this amount in that he was entitled to 10 cents per crate as a packing charge and that he instructed the bookkeeper to recalculate the cost of operation accordingly. Costa testified that there was no such arrangement and that everything was to be done on an actual cost basis. Defendant, in the final accounting, was charged with the amount returned for "top ice" and his claim to the 10 cents per crate packing charge was disallowed. The evidence supports this finding. The question of conflict of evidence was for the trial court's determination.

The last point raised involves the question of accord and satisfaction. On July 1, 1942, defendant Maggio drew a check on the partnership account in the sum of $7,126.95, which was payable to Costa. Defendant alleges in his answer that he rendered an accounting to plaintiff from time to time; that a dispute arose as to the "top ice charge" and the claimed credit due on the "Watanabe Patch"; that plaintiff agreed to allow defendant 10 cents per crate packing charge; to exclude the "Watanabe Patch" from the partnership accounting; and that he accepted, in settlement of the dispute and partnership accounting, the $7,126.95 check. The check, received by plaintiff on July 1, 1942, and cashed on September 10, 1942, had endorsed thereon: "According to final settlement of dealings in partnership." As to this transaction, the evidence shows that not until July 1, 1942, had Maggio's bookkeeper made up any form of final statement; that a rough pencil account was prepared which set forth only the ultimate result of profits realized on the respective patches. The accuracy or inaccuracy of the statement could only be determined by an investigation of vouchers, checks, invoices and other voluminous records. The document as thus prepared was not such an accounting as would disclose the entire transactions. Defendant's bookkeeper admitted that he was to prepare a further accounting for plaintiff. Such an accounting was not prepared until a few days before trial. Plaintiff, at the time he attempted to cash the check, struck off the words contained thereon regarding the settlement. The bank refused to cash the check as thus modified. On advice of counsel, plaintiff later reinstated that portion, cashed the check, and,

by letter, notified defendant that the sum received on the check was to apply on the amount due him; that a full accounting had not been furnished him as promised and indicated that certain discoveries had been made by him respecting the accounting which would show that more money was due him. Plaintiff demanded another and corrected accounting. Defendant called at plaintiff's atorney's office and promised to render one as soon as his bookkeeper, who was away, had returned. No further accounting was made until time of trial.

After hearing all of the evidence the trial court found that there was no agreement between the parties to the effect that defendant was to have 10 cents per crate over actual cost of packing; that $30 per car received by defendant for "top ice" was omitted from the accounting rendered to plaintiff; that certain discounts were obtained by defendant for material purchased which were not reflected in the statement; that plaintiff demanded an accounting, but defendant failed and refused to furnish one; that when the complaint in this action was filed defendant was about to depart from the county of Imperial for parts unknown; that on July 1, 1942, defendant drew the check for $7,126.95 and delivered it to plaintiff. But the court found "that said check. . . . represented only the amount which the defendant admitted owing to the plaintiff in connection with said partnership operations and nothing in excess thereof and that the plaintiff accepted said check only upon account, and . . . that there was not an accounting, accord or satisfaction between the plaintiff and the defendant in connection with said partnership operations and profits." ■ Where the parties to an executed agreement of accord and satisfaction have met upon equal terms, and without fraud, misrepresentation, or mistake, have adjusted their existing differences concerning their relative rights and obligations arising out of a valid, preexisting agreement, it is neither necessary nor permissible to go behind a settlement actually made, for the purpose of ascertaining which of the parties was right in a controversy which preceded and constituted the basis of such settlement. ■ However, before a dispute concerning a claim for money alleged to be due under an existing contract can be made the basis of an agreement of accord and satisfaction, it must be shown that such dispute was bona fide. ■ It is for the trial court to determine from all the circumstances of the transaction

462

whether the apparent or purported dispute or the controversy claimed to exist by the one urging the accord and satisfaction was in truth and fact a bona fide one.  ██  When the court in this case found that there was not an accord and satisfaction, it may have done so upon the basis of all of the facts submitted to it and determined that the defendant was not in good faith in his conduct or his contentions; that he was in fact acting fraudulently and in bad faith and that he was attempting to fraudulently evade and avoid the obligation he knew to be due. Other cases bearing upon the subject and emphasizing the necessity of there being good faith in the dispute are *Cloyne* v. *Levy,* 26 Cal.App. 637 [148 P. 224]; *Work* v. *Associated Almond Growers,* 102 Cal.App. 232 [282 P. 965]; *Everhardy* v. *Union Finance Co.,* 115 Cal.App. 460 [1 P.2d 1024]; *Messer* v. *Tait's, Inc.,* 121 Cal.App. 698 [9 P.2d 536]; *B. & W. Engineering Co.* v. *Beam,* 23 Cal.App. 164 [137 P. 624].

The evidence fully supports the trial court's finding that there was no true accounting and that no accord and satisfaction resulted.

Judgment affirmed.

Barnard, P. J., concurred.

A petition for a rehearing was denied August 29, 1944.