[Civ. No. 24364.   Second Dist., Div. One.   Aug. 1, 1960.]

SOUTHERN CALIFORNIA DISINFECTING COMPANY (a Corporation), Respondent, v. GEORGE LOMKIN et al., Appellants.

432

Berkowitz & Rhodes, Meyer Berkowitz, Roland Maxwell, Paul H. Marston and Richard W. Olson for Appellants.

Paul R. Hutchinson for Respondent.

FOURT, J.—This is an appeal from a joint and several money judgment in favor of the plaintiff and against the defendant Lomkin, who was a former employee of the plaintiff, and against Richard A. Munnecke and defendant corporation, Calar Chemical Company, the present employers of Lomkin for, among other things, unfair solicitation of customers and unfair competition.

The court made extensive findings based upon substantial evidence or the inferences which might be drawn from such evidence. A résumé follows.

The plaintiff at the time of the bringing of the action was a California corporation. The defendant, Munnecke, was the president of Calar Chemical Company, a California corporation, hereinafter referred to as Calar and he acted for Calar in the transactions in question. The plaintiff was engaged in the sanitary maintenance supply business, had a large warehouse and kept on hand a large stock of supplies which were sold in the business by plaintiff to its customers throughout parts of Southern California. The customers were principally schools, hospitals, hotels, apartment houses and motels, cafés, garages, military camps, amusement parks and establishments which maintain rest rooms for the use of the public or their own personnel.

The plaintiff's business was started in 1912 and for years was operated by an individual. In 1946 the business was transferred to a California corporation which bore the same name as plaintiff and which corporation operated the business until about January of 1954 when that corporation was dissolved and the assets were transferred to a partnership. The business was operated by the partnership until about February of 1957 when plaintiff company was incorporated and all of the assets were transferred to it, including the good will of plaintiff's predecessors, the trade lists and cus-

tomer lists. The plaintiff is now the sole owner and operator of the business. There has been built up by plaintiff and its predecessors a large and profitable business and a valuable good will based upon, among other things, customer lists consisting of regular customers who regularly purchase products of plaintiff and have done so for many years and who, but for the interference of the defendants, would have continued to purchase the products of the plaintiff. Not all of the plaintiff's customers purchased plaintiff's products exclusively; a number purchased some products from plaintiff's competitors depending upon prices and conditions existing at the particular time the customer was solicited or upon the customer's particular needs. However, some of the plaintiff's customers purchased substantially all of their needed products from the plaintiff.

The plaintiff's list of about 3,000 customers is kept alphabetically in its office where one card is assigned to each customer. It was the practice to maintain on the cards information with reference to its business relations with such customers. Some of the cards contained the customer's name, address and telephone number, the name of the person in charge of making purchases for the customer, the name of the janitor, custodian, superintendent or other person responsible for the maintenance of the particular premises and the kind of merchandise used. In some of the cases the financial condition of the customer and his reputation for paying his bills were noted on the cards. In addition to the card system there were separate folders for many of the customers which contained records of invoices and correspondence between plaintiff and such customers.

The business of plaintiff is divided into routes or territories and one salesman is assigned to each route. In addition to the records heretofore mentioned, the plaintiff had a route book for each route containing the names and information concerning each customer in the route which was furnished to each salesman and which books were to be kept up and maintained by the salesman for the use of the plaintiff. In addition to the other information, the route book provided space or pages for each customer wherein there was to be set forth the information as to who should be seen for the purpose of obtaining orders, the day of the week, day of the month or other time when the customer should be called upon, the nature, amount and dates of purchases made by the customer in the past and other information of value to the plaintiff acquired by the salesman in the course of serving

the customer. It was the duty of each salesman to maintain the route book for the route assigned to him in such manner that in the absence of the regular salesman any other representative of the plaintiff could take the book and call upon the plaintiff's customers and conduct the business without loss or inconvenience to the plaintiff.

All of the information in the records and lists was secret and confidential and could not be acquired legitimately in any way other than by years of experience and the expenditure of large amounts of money. Plaintiff's salesmen were orally instructed that the information was confidential and valuable and that it was not to be disclosed to anyone else and was to be kept in trust solely for the use and benefit of plaintiff.

On about January 23, 1951, the plaintiff's then existing predecessor employed the defendant, George Lomkin, as a salesman, assigned him to a route and furnished him with the information contained in the records. Lomkin continued to work for plaintiff's predecessors and for plaintiff. In July, 1955, Lomkin was promoted to the position of sales manager in charge of all sales of the business as well as sales in the territory assigned to him. On April 19, 1957, plaintiff turned over to Lomkin one of its route books with the spaces or pages for the information about each customer. At that time Lomkin agreed in writing as a part of his continued employment to return the route book to plaintiff complete and in reasonably useful condition at the time of the termination of his employment. Lomkin was instructed to keep up the book and place therein valuable and confidential information with reference to plaintiff's customers and the route assigned to him and Lomkin thereafter did so. In May of 1957 Lomkin was promoted to the position of supervisor where he supervised the sales in all of the sale routes in addition to his own. While in the capacity of sales manager and supervisor Lomkin had access to all of the information on plaintiff's records and route books and became acquainted with a great number of the large and most valued customers of plaintiff and all of the confidential information with reference to such customers. In October, 1957, Lomkin was demoted from supervisor to salesman and his services were then confined to the route assigned to him.

When Lomkin was a salesman he was instructed to call on the customers on the dates and at the times as indicated on the respective cards and to become personally acquainted with the purchasing managers, persons in charge of main-

tenance and others at the places of business of the customers and to become familiar with the needs of the customers, the prices paid by them for merchandise, their record of payments, of charges made and generally to give his full time and efforts to serving the best interests of plaintiff with reference to its relations with the customers in the route and to build up good will and profits of the plaintiff's business all in consideration of the money paid by plaintiff to Lomkin.

On about March 1, 1958, Lomkin and Munnecke, acting for and on behalf of defendant, Calar, entered into a conspiracy to defraud the plaintiff of its trade lists and the business of its customers. The defendants were to get cards and advertising printed forthwith showing Lomkin as being associated with defendant, Calar. Lomkin was to continue in the employ of plaintiff under the guise of working for the plaintiff and call upon plaintiff's customers as a faithful employee when in truth and in fact he was to give to the plaintiff's best customers the cards and advertising showing Lomkin's association with Calar and to solicit the patronage of plaintiff's said customers for the defendants; it was planned that Lomkin would, whenever possible, take orders from the customers and instead of sending such orders to the plaintiff would send them to Calar to be filled; that after he had solicited the business of the good customers of plaintiff known to him, while being paid by the plaintiff as a supposed loyal employee, he would quit the employ of plaintiff and go into business with the defendants in competition with plaintiff and regularly thereafter call upon plaintiff's customers and solicit their patronage in the name of Calar; that he would take with him upon his termination of employment by plaintiff the sheets from the route book containing the information about the customers in the route where he was working so that he could have the valuable, confidential information therein contained and thereby be in a position to solicit and hold the plaintiff's customers and at the same time by withholding the sheets from the route book interfere with plaintiff's ability to operate the route successfully.

Pursuant to the conspiracy the defendants furnished to Lomkin cards containing his name as a representative of Calar which cards Lomkin passed out to the customers of the plaintiff for the purposes of soliciting the business of such customers for the defendants, and Lomkin did solicit the business of plaintiff's customers for the period from March 1, 1958, to April 11, 1958, and in March did obtain at least one order

from a customer of plaintiff with the express knowledge and approval of defendants and secreted said order from plaintiff and placed the same with Calar. From April 1, 1958, to April 11, 1958, Lomkin, acting for the other defendants, obtained about 23 orders from regular customers of plaintiff and diverted the same to the defendant Calar. Munnecke and Calar, with full knowledge of the facts, accepted the orders and paid Lomkin a commission on such sales. On about April 9, 1958, Lomkin called on a school and solicited an order from the person with whom he customarily dealt and Lomkin failed fully to advise the persons connected with said school that he was about to quit the plaintiff and that he was going to place the order of such school with a firm other than plaintiff.

On April 11, 1958, without any prior notice or warning and without cause or reason, Lomkin notified the plaintiff that he was quitting his employment forthwith, and he did thereupon leave the employ of plaintiff. At that time he was requested by plaintiff to surrender the route book and list of customers for the route he had been servicing. Lomkin surrendered the book. However, he had previously removed from the book the sheets with reference to about 135 customers which he had served and had left in the book only a few sheets which referred to some small accounts on the route. The sheets which Lomkin had removed were with reference to the largest and most valued customers of the plaintiff. Thereafter Lomkin had copied onto sheets in a book of his own, substantially all of the information pertaining to said valued customers to the end that he would have such information readily available for his own use in soliciting the most favored and profitable customers on behalf of himself and the other defendants.

The information on such sheets was of great value to the defendants in obtaining the patronage of plaintiff's customers. After Lomkin had removed the pages from the route book he placed in the route book blank pages so as to make it appear to be filled and substantially in the form it appeared to be in before the pages had been removed. Lomkin delivered the book to plaintiff with the information and pages deleted therefrom in such a manner that plaintiff had no knowledge of the fact that the pages had been removed and plaintiff was led to believe by Lomkin that he had returned the book in accordance with the written agreements. On the date of termination of employment, Lomkin was asked if he intended to compete with plaintiff and although Lomkin was then working for the other defendants in competition with the plaintiff, he stated to plain-

tiff that he was not going into a similar business or in competition with the plaintiff. The untruths told to the plaintiff about his future work plans and the stuffing of the route book with the blank pages was done to deceive the plaintiff and to give the defendants more time and opportunity in which to contact plaintiff's customers and to use the confidential information in an endeavor to secure the patronage of plaintiff's customers.

On about May 15, 1958, the plaintiff rendered to Lomkin a statement which on its face shows that it was with reference to Lomkin's account with plaintiff for pay, car allowance and commissions. The statement showed that Lomkin had overdrawn his commissions and owed the plaintiff thereon the sum of $130.60. Lomkin approved the account and sent plaintiff a check for the amount and wrote on the back thereof ''Pay only to Southern California Disinfecting Co. in full payment of all claims against me.'' The check was cashed by the plaintiff.

Prior to March 1, 1958, the plaintiff had a patronage of about $5,000 per month in gross sales to its regular customers in the route served by Lomkin for the plaintiff. In April of 1958 Lomkin solicited or secured orders from the regular customers in the route and fraudulently diverted such orders to Calar in the amount of about $4,000, and during the month of May, 1958, in the amount of about $3,000. The defendants would not have obtained any of said business had Lomkin not solicited the customers of plaintiff while still employed by plaintiff and used in so doing the confidential information of plaintiff.

The court found that the plaintiff would continue to suffer further loss because of the diversion of the patronage of the customers to the defendants and the interruption of the patronage of the said customer which reasonably would be expected to continue but for the acts of the defendants. The court also found that the defendants would continue to solicit and obtain the patronage of plaintiff's customers and by using the information secured by Lomkin the defendants would be able to take the best of plaintiff's customers and have a trade advantage. However, the court also found that there was no impending or threatened damage to plaintiff to be arrested by an injunction and that a prohibitive injunction would be of no material benefit to the plaintiff. By reason of the acts of the defendants the plaintiff was prevented for a considerable period of time from placing another salesman in the field to

solicit its regular customers. Some of the information which was contained on the pages of the route book which were lifted by Lomkin was not contained on the records in the office of the plaintiff.

The court found that Munnecke knew that Lomkin had not given a notice of termination to plaintiff and that such notice was being withheld and that Lomkin was intending to and would go into the employ of Calar, as a competitor of plaintiff and that the defendants furnished to Lomkin not only cards but other advertising matter to be used in soliciting the business away from the plaintiff to the defendants. Lomkin acted with the knowledge, consent and ratification of the other defendants. Calar subsequently paid to Lomkin a commission on the sales fraudulently obtained by Lomkin.

The court further found that Lomkin, Munnecke and Calar previously had entered into the conspiracy to accomplish the matters heretofore set forth and were jointly and severally liable for the acts of Lomkin as a coconspirator in accomplishing the objects of the conspiracy. Also the court found that the plaintiff had complied with all of its agreements and understanding. The loss of the route book was placed at $1,500 by the court. The damage to the plaintiff by the loss of business through the acts and concert of the defendants during the period to April 11, 1958 and for a time thereafter until the plaintiff was able to solicit its customers for the purpose of recouping its lost business was the sum of $3,500. There was oppression, fraud and malice by the defendants toward the plaintiff and by way of example and by punishing the defendants for their wrongful acts the court granted another $1,000 to the plaintiff by way of damages saying that "the conduct of the defendants amounted to stealthy connivance to pirate business unfairly . . ."

Appellants, Munnecke and Calar, were represented at the trial by counsel and Lomkin appeared by separate counsel. Briefs in this court were likewise separately filed.

Appellant Lomkin contends (1) that the acceptance of his check under the circumstances amounted to an accord and satisfaction and was a bar to this action; and (2) that the information which he acquired by calling upon customers while employed with plaintiff with regard to their habits of buying, their financial worth, their individual characteristics and preference was not the property of plaintiff and he could make use of such information after he became employed by Calar.

Appellants Munnecke and Calar contend that: (1) the employee of one company may advise his customers that he is changing employment prior to termination by means of cards and orally telling the customers of the change; (2) that the accounts of customers of Lomkin while he was with plaintiff did not constitute trade secrets and were not confidential information; (3) plaintiff did not meet the tests to justify relief against the defendants; (4) doctrine under which injunctive relief is granted should not be given application that would overemphasize the employer's rights; (5) evidence does not justify a finding of a conspiracy between Lomkin and the other defendants; (6) damages should have been limited to the loss of business from April 1, 1958, to April 11, 1958, that plaintiff would have sustained if Lomkin had given notice of termination on April 1, 1958, and damages for the route book should not have been awarded against Calar and Munnecke.

Considering first Lomkin's contention with reference to the check. It was never contended by Lomkin at any time until during the course of the trial that the check was meant to be a tender in full settlement of the controversy in question. Lomkin himself testified in effect that he wrote the check because the plaintiff had sent him a bill for the $130.60 overdraft of commissions.

It is set forth in 1 California Jurisprudence 2d 239, section 7:

"There is no strange magic in the legal doctrine of accord and satisfaction. An accord must be the result of an agreement, which may be express or implied. The primary principles governing the law of contracts are applicable in determining whether there is an accord and satisfaction, and it is fundamental that there must be a consent or meeting of the minds of the contracting parties.

"The intention of the parties is an essential consideration, and whether an agreement amounts to an accord depends upon their mutual intention, as shown by the terms of the agreement viewed in the light of the surrounding facts. The understanding of the parties must usually be determined from the circumstances surrounding the transaction, including the parties' statements, declarations, and conduct. But the circumstances must be of such character as to express in a clear manner an intention to be affected, or an accord is not shown.

"It must also be shown that the agreement is to accept something different from or less than the amount due,

and that the parties intend the sum paid to be accepted in extinction of the amount due.''

The statement in this instance showed on its face that the present controversy was not under consideration in the statement of account which was delivered to Lomkin. There was no meeting of the minds between the parties at the time which had as its purpose the satisfaction of the present controversy for the $130.60 due on the commission overdrafts. The plaintiff received by the check nothing more than that which it was already entitled to receive.

It is set forth in 1 California Jurisprudence 2d 250, section 11:

''With respect to an employee's right to wages and bonus due under a contract of employment, there was no accord and satisfaction where the employee merely accepted checks issued under a new method of bookkeeping but did not acquiesce in the new method, for there was no meeting of the minds. And where checks are sent to pay earned commissions which the debtor admits are due and owing, the creditor, in accepting the checks, receives nothing more than he is entitled to by the debtor's express admission. Hence, he receives nothing different from or less than that to which he is entitled, and there is no accord and satisfaction. Even where the creditor accepted commissions from time to time at a certain rate, if he at all times demanded full commissions at a higher rate on certain specified sales and deliveries, and the debtor told him 'we will settle up with you at the end of the year,' there was no accord and satisfaction.''

There was nothing in Lomkin's answer (filed in August, 1958) or in his pretrial statement (filed in December, 1958) to the effect that he had settled with the plaintiff by a check. As between Lomkin and the plaintiff, Lomkin was the only one who knew of the extent of the duplicity which had been practiced upon the plaintiff at the time the check was received. There was nothing explicit and unequivocal about the tender (excepting that it matched exactly the amount claimed by the plaintiff for overdrawn commissions); if Lomkin had intended to include his fraud and the damages caused thereby in the check transaction, he should have so stated. The plaintiff was entitled under the circumstances to know if it was to be bound by a release with reference to the matter of the customer route book, lists, etc. (*Weller* v. *Stevens*, 12 Cal.App. 779 [108 P. 532]; *Messer* v. *Tait's, Inc.*, 121 Cal.App. 698 [9 P.2d 536]; *Costa* v. *Maggio*, 65 Cal.App.

2d 456, 462 [150 P.2d 905]; *Egan* v. *Crowther,* 74 Cal.App. 674 [241 P. 900].)

Accord and satisfaction is new matter and constitutes an affirmative defense and must be specially pleaded before it is available to Lomkin. (1 Cal.Jur.2d 283; *Berger* v. *Lane,* 190 Cal. 443 [213 P. 45].)

The trial judge denied Lomkin's motion to amend. There was, under the circumstances, no abuse of discretion.

Considering next the second contention of Lomkin. All of the cases cited by Lomkin are with reference to situations where the employee quit his employment and thereafter went to work for another employer and then attempted to take the business of the former employer to his new employer. None of the cases cited consider a situation where the employee pursued a course of conduct such as was pursued in this case.

Proceeding to the contentions of appellants Munnecke and Calar. Section 2860 of the Labor Code provides as follows:

"Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment."

Referring to the statute, it is stated in 32 California Jurisprudence 2d 417, section 18:

". . . This statute is merely an expression of the familiar principle that forbids an agent or trustee to use the trust property or powers conferred on him for his own benefit."

An agent must not put himself in a position, with reference to the business, where his interests are contrary and antagonistic to the employer. In 2 California Jurisprudence 2d 775, section 106 it is stated:

". . . This means that the agent is not permitted to obtain any advantage over his principal by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind. He may not use or deal with the subject matter of the agency for his own profit, or for any purpose unconnected with the agency in any manner."

It is true that an employee of a company may advise the customers that he is changing his employment prior to the termination of the employment by means of cards and by orally informing such customers of such fact. However, that is not all that was accomplished in this case. Munnecke gave Lomkin one of Calar's catalogues and price lists to

carry with him for about a month prior to April 11, 1958; Munnecke gave Lomkin permission to quote lower prices than Calar's regular prices in order to compete with the plaintiff and to get orders for Calar while calling on the customers as an employee of plaintiff. Lomkin passed out several hundred cards, actively solicited the patronage of the customers and endeavored to persuade them to quit patronizing plaintiff for at least a month prior to terminating and during all of the time was taking plaintiff's money as its employee. There is a wide gap between wrongful solicitation and stealing the valuable parts of a route book, and ordinary proper advertisement. The cited case of *Continental Car-Na-Var Corp.* v. *Moseley*, 24 Cal.2d 104 [148 P.2d 9] is not in point for a number of reasons. First, all Moseley did in that case ". . . was the sending out of a form letter to certain customers of plaintiff." There was no secret list of customers or other confidential information obtained or used by Moseley; there was no evidence that the customers of Continental were regular customers, on the contrary any sales to them constituted a ". . . distinct transaction, not necessarily implying that another will follow." All sales were made after Moseley's termination of employment and the sales were not made because of Moseley's acquaintance or knowledge of the customer's business but as the result of salesmanship as to quality and price. In the Continental Car-Na-Var Corp. case the court said at page 111: "The defendants were free to solicit the former customers of plaintiff without restriction, *so long as no unfair trade practices were indulged.*" (Emphasis added.)

Appellants have relied heavily upon *Aetna Building Maintenance Co.* v. *West*, 39 Cal.2d 198 [246 P.2d 11]. That case is of no assistance to them in this case. The court stated at page 203 in deciding the Aetna case: "There is no evidence whatever of any suggestion to an Aetna customer that it cancel Aetna's contract and give him (West) the business." It is further stated at page 204: "Merely informing customers of one's former employer of a change of employment, *without more,* is not solicitation." (Emphasis added.)

Appellants also cited *Mathews Paint Co.* v. *Seaside Paint etc. Co.*, 148 Cal.App.2d 168 [306 P.2d 113] but the court in that case said at page 175 that the defendants were ". . . accused of nothing except selling to former customers of the plaintiff in a field that is known to and open to all competitors." The court also pointed out that it was not alleged that there was anything secret about the plaintiff's customers

lists and that the information contained therein could have been acquired by any competitor. The other cases cited by appellants are not in point for substantially the same reasons as above outlined.

Considering next appellants' contentions that the accounts of Lomkin while with the plaintiff did not constitute trade secrets nor were they confidential information. The information which Lomkin and the other defendants took from the plaintiff was not an ordinary list which might be compiled from a telephone book or a directory. The cards and records contained information with reference to the course and custom of the customers' dealings, the reputation and credit standing of the customer (to name but a few of the items) which are often more valuable to an entrepreneur than the physical plant. In this case Lomkin used the recorded information which he could not have secured other than as an employee of plaintiff to the detriment of plaintiff while he was still supposedly working for the plaintiff. He could no more lawfully take what he did take than he could take the desk and chairs in the office of the plaintiff. Obviously the information which the defendants secured was such that Lomkin could not remember it all without taking the information and writing it down in his own book, otherwise he would never have taken the pages representing the most valued customers from the route book.

There can be no doubt that the assets of plaintiff appropriated by the departing Lomkin lay within the ambit of his duty to the plaintiff. It is practically undisputed that Lomkin, for the benefit of the defendants, made use of the information which he had secured in his capacity as a fiduciary. In this case he was under an extraordinary duty for he had agreed in writing to return the list and did not do so. This case is not the usual commercial hitchhiking of a former employee but rather it is trade secret larceny.

The privilege of competition is limited by the nature of things by a legal standard of fairness to the method of competition and the motive of the competitor. Any abuse of the privilege is the basis for imposing liability. Standards change as public policy changes with reference to competition in business as business is modified by social and economic conditions; however, deception has always been and is now recognized as bad conduct.

Appellants assert in their third contention that plaintiff did not meet the tests as set forth in *Aetna Building Maintenance Co.* v. *West, supra,* 39 Cal.2d 198, 204, by establishing the five

factors or items referred to in that case. (See 41 Cal. L. Rev. 38 for one writer's views on how the "five test" rule apparently was adopted in the first instance.)

There is no statement in the Aetna case to the effect that where fraud, deceit, breach of contract and deception are present, as they are so present in the case at hand, the business of plaintiff is open to invasion on the part of a former employee and a scheming entrepreneur. The court said in the Aetna case, *supra,* 39 Cal.2d 198 at 203: "The question, therefore, is whether West was guilty of *unfair competition* in soliciting Aetna's customers." And, "There is *no evidence* whatever of any suggestions to an Aetna customer that it cancel Aetna's contract and give him the business." The Aetna case and the present case are dissimilar in almost every respect. However, the court in this case might well have found from the evidence, or the inferences drawn therefrom, that the five factors referred to in the Aetna case were present but it was not necessary to categorize the matter, there was much more here than the five factors referred to in the Aetna case. (Emphasis added.)

Appellants' next and fourth claim in effect is that the doctrine of injunctive relief should not be applied so as to overemphasize the employer's rights to the detriment of the rights of the employee. Appellants cite *Mathews Paint Co.* v. *Seaside Paint etc. Co., supra,* 148 Cal.App.2d 168, as authority for their position. In the Mathews case the court said of the employees who left Mathews to go with Seaside that they ". . . are accused of nothing except selling to former customers of plaintiff in a field that is known to and open to all competitors of . . ." Such is not the case before this Court. There is nothing in the Mathews case which places the stamp of approval upon commercial immorality or the stealthy misappropriation of the former employer's business.

It is further claimed that the evidence did not justify a finding of a conspiracy between the defendants. Appellants rely heavily upon the case of *Continental Car-Na-Var Corp.* v. *Moseley, supra,* 24 Cal.2d 104. In the Continental case the court at page 112 found that there was *"no evidence* in the record which would uphold the finding of the trial court that the defendants 'wrongfully conspired' to injure and destroy the business of plaintiff." (Emphasis added.) Further, it was said at page 113 with reference to the solicitation of former patrons of the former employer that ". . . only where the employee is in the possession of secret information not readily

accessible to others and acquired by reason of his employment, will courts afford . . . relief.''

In the case before us Lomkin, after collaborating with Munnecke and arranging for Lomkin to be employed by Calar, with Munnecke's knowledge and approval, posed as a loyal employee of plaintiff to the end that defendants could faithlessly and secretly divert the business of plaintiff to the defendants. A conspiracy is merely a combination of two or more persons to accomplish an evil or unlawful purpose. Reference is made to the facts heretofore stated for abundant evidence of the conspiracy between the defendants. If, through fraud and conspiracy, Munnecke assisted Lomkin in violating his obligations to the plaintiff and thereby made profits which they otherwise would not have received, the defendants Munnecke and Calar became equally liable for all of the consequences of the conspiracy. It is not the conspiracy but the civil wrong which gives rise to the cause of action. (*Anderson* v. *Thacher,* 76 Cal.App.2d 50, 72 [172 P.2d 533].)

Appellants' last contention is that damages were not properly awarded. According to the findings and the conclusions of law the first item of damages awarded was for the loss of the information contained in the route book in the sum of $1,500. Appellants contend that Calar and Munnecke had nothing to do with the route book and therefore they should not be held liable for any damage arising out of what occurred. They overlook the fact that Lomkin was in their employ when the pages of the route book were stolen. They also assert that the plaintiff made no demand for the return of the torn out pages and therefore no damages are recoverable. While it is true that plaintiff discovered shortly after April 11, 1958, that some of the pages were missing from the route book it was not until Lomkin's deposition was taken about five months later, that plaintiff found out that Lomkin had taken the pages out and had later destroyed them. Under the circumstances, we do not believe that a failure to make a demand was fatal to the claim for damages. (See *Halleck* v. *Moss,* 22 Cal. 266; *Cummings* v. *Howard,* 63 Cal. 503; *Bryson* v. *McCone,* 121 Cal. 153 [53 P. 637].) Of course, defendants now say in effect that had a demand been made for the removed pages that they would have returned the pages immediately and that in such a situation the plaintiff would not have been required to expend so much time in reconstructing the route book and in recouping the business on the route. The evidence in this case does not bear out any such ethical consciousness upon the part of

the defendants. It must be kept in mind that we are dealing with the willful and knowing conversion and destruction of plaintiff's route book. Had the defendants not thought the book valuable to their scheme they undoubtedly would not have taken therefrom the sheets which contained the important information concerning the most valued customers of the plaintiff. Had the defendants desired to avoid liability in this segment of the case, they could have done so by the simple action of returning the book intact in accordance with the written agreement between Lomkin and the plaintiff. The evidence is clear that it was extremely difficult for plaintiff to send another salesman onto the route under the circumstances and to attempt to regain some of its customers.

The second item of damage was for $3,500 for "Loss of business through the acts and concert of the defendants during the period to April 11, 1958 and for a time thereafter, until plaintiff was able to solicit its customers for the purpose of recouping its lost business. . . ." Appellants complain because as they say the evidence does not disclose an exact amount of dollar damage. There was evidence that plaintiff's profits were 40 per cent over costs of the goods sold and that under the circumstances, all of the proceeds of the sales in question over the costs were profits lost to the plaintiff. In April, 1958, the defendants received $4,000 in business from the plaintiff's customers, in May of 1958 about $3,000 and Lomkin admitted that for several months after April 11, 1958, after his employment by Calar, about one-half of the business he produced for Calar came from customers whom he had served while employed by the plaintiff. Further, he testified that the business of the first "few months" so taken from the plaintiff averaged about $3,000 a month. It would appear that under the facts the judgment could have been much larger than it was.

In 14 California Jurisprudence 2d 688, section 62, it is stated:

"It is provided by statute that a plaintiff can, in a judicial proceeding, be awarded damages for detriment sustained after its commencement or which he is certain to sustain in the future. Under this statute a plaintiff can recover not only compensation for damage proximately sustained by him from a breach of contract after the commencement of an action therefor, without filing a supplemental pleading to support such recovery, but he can also, in a proper case, obtain an award of damages for a future detriment to be sustained from

the breach. In order to do this, the plaintiff must show with reasonable certainty that detriment from the breach will accrue to him in the future, but future damages may be allowed if the evidence presented by him is sufficient in strength to comply with this requirement. The jury may, in considering the evidence, proceed on a theory of reasonable probabilities. It may, therefore, accept as proved those results which, under similar circumstances, generally occur in fact. The latitude thus accorded to the jury, however, does not mean that it can allow future damages to the plaintiff on any plausible ground, since it is limited to a consideration of those contingencies reasonably likely to occur, and which are reducible to a present monetary evaluation. ▆▆▆ However, the fact that the amount of such damages may be incapable of exact determination, or that it may be subject to various contingencies, does not bar recovery. Consequently, a reasonably approximate estimation is deemed to be sufficient, and the existence of a satisfactory method of achieving this estimation will preclude the defendant, whose wrongful act gave rise to the plaintiff's injury, from complaining that the amount of future damages cannot be determined with mathematical precision.''

▆▆▆ In this case the plaintiff demonstrated that it had a fixed volume of business on the route which Lomkin worked and that it had enjoyed the business of its customers for many years. It is reasonable to assume that the plaintiff would have continued to enjoy that patronage for a reasonable time but for the wrongful diversion of the customers to the defendants. ▆▆▆ Courts need not permit the loss of a substantial right merely because of a claimed uncertainty or difficulty in determining the extent of the damage from such a loss.

In *Reid* v. *Mass Co., Inc.*, 155 Cal.App.2d 293 [318 P.2d 54], the defendant made a contention similar to those made by the defendant in this case pertaining to the award of damages and the court said, among other things, at pages 307-308:

''There is abundant evidence in the present case from which the trial court could infer that the sharp decline in plaintiffs' profits was directly caused by defendants' wrongful acts. It was admitted that defendants' accounts included 58 former customers of plaintiffs; the depositions introduced by plaintiffs indicated that many of these customers would have renewed their contracts with plaintiffs but for the actions of defendants. Defendants rely on the fact that only 50 per cent to 70 per cent of plaintiffs' customers renew their

contracts and argue from this that computation of damages is impossible. But it is clear that some damage to plaintiffs' business was being caused by defendants and 'one whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could not be measured with exactness.' (*Zinn* v. *Ex-Cell-O Corp.*, 24 Cal.2d 290, 297-298 [145 P.2d 177].)'' (See also *Laird* v. *Steinmann*, 97 Cal.App.2d 781, 782, 786 [218 P.2d 780]; *Employees' Participating Assn.* v. *Pinc*, 91 Cal.App.2d 299 [204 P.2d 965].)

The third item of damages allowed was for $1,000 by way of example. ▉▉▉ What was said by the court in *Ward* v. *Taggart*, 51 Cal.2d 736, 743 [336 P.2d 534] is entirely appropriate here:

''Courts award exemplary damages to discourage oppression, fraud, or malice by punishing the wrongdoer. (See McCormick, Damages, § 79; Morris, *Punitive Damages in Tort Cases*, 44 Harv.L.Rev. 1173, 1185-1188.) ▉▉▉ Such damages are appropriate in cases like the present one, where restitution would have little or no deterrent effect, for wrongdoers would run no risk of liability to their victims beyond that of returning what they wrongfully obtained. (*Haigler* v. *Donnelly*, 18 Cal.2d 674, 680-682 [117 P.2d 331]; *Taylor* v. *Wright*, 69 Cal.App.2d 371, 384-386 [150 P.2d 980]; *Hartzell* v. *Myall*, 115 Cal.App.2d 670, 676-678 [252 P.2d 676]; *Foster* v. *Keating*, 120 Cal.App.2d 435, 454-455 [261 P.2d 529]; *Devers* v. *Greenwood*, 139 Cal.App.2d 345, 350 [293 P.2d 834].) The record herein discloses no abuse of discretion in the award of exemplary damages. (*Brewer* v. *Second Baptist Church*, 32 Cal.2d 791, 802 [197 P.2d 713]; *Finney* v. *Lockhart*, 35 Cal.2d 161, 164 [217 P.2d 19]; *State Rubbish etc. Assn.* v. *Siliznoff*, 38 Cal.2d 330, 340-341 [240 P.2d 282]; *Hartzell* v. *Myall, supra; Foster* v. *Keating, supra;* see 14 Cal. Jur.2d 813-818.)''

Here the route had averaged about $5,000 per month for several years before the Lomkin-Calar scheme came to fruition and thereafter the route fell off to $2,000 per month and Calar gained $3,000 per month. A very substantial part of that business came from business produced by Lomkin from customers he had regularly served for plaintiff.

▉▉▉ Exemplary damages are proper in cases involving fraud and may be allowed even though the tort incidentally involves a contract. (*Haigler* v. *Donnelly*, 18 Cal.2d 674 [117 P.2d 331]; 14 Cal.Jur.2d 808; Civ. Code, § 3294.)

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.