[L. A. No. 21876. In Bank. July 8, 1952.]

AETNA BUILDING MAINTENANCE COMPANY, INC.,
Respondent, v. JAMES A. WEST, Appellant.

A. V. Falcone and Arthur J. Manley for Appellant.

Victor S. Cogen for Respondent.

EDMONDS, J.—For about three years, James A. West was employed by Aetna Building Maintenance Company, Inc., as a salesman and supervisor. After he left that employment and engaged in the same business, Aetna sued him for dam-

ages assertedly resulting from unfair competition. A second cause of action was based upon a written contract which included an agreement by West to pay liquidated damages of $1,000 in the event that he failed to carry out its provisions. The appeal is from a judgment in favor of Aetna awarding it damages and permanently enjoining West from soliciting any of its customers.

The complaint alleges that, during his employment, West became familiar with the details of its business, including customer lists, the extent and type of service required by its customers, the use of certain procedures, material and equipment, the net costs of performing service for each customer and the charges made for it. Aetna claims that with this information, which, it asserts, constitutes trade secrets, West solicited some of its customers to transfer their patronage to him and obtained contracts to do work for them.

The record includes a contract executed by the parties during the time of West's employment by Aetna. One provision of it is that West would not, during his employment and for a period of two years thereafter, disclose any trade secrets or business information acquired as an employee. Upon termination of his employment, he promised to surrender all business records and other property belonging to Aetna. He also agreed not to ''solicit, serve and/or cater to any of the customers of the Company served by him'' as an employee for a period of two years after termination of his employment. In the event that he breached any of the terms of the agreement, he promised to pay $1,000 as liquidated damages, together with any exemplary damages which might be awarded in an action against him. Aetna retained the right to restrain the violation of the agreement.

There is evidence showing that West had told three out of about 50 to 75 establishments with which he had worked for Aetna that he had gone into business for himself. He notified one of them of his intentions before leaving Aetna. The other two were informed of his plans after they learned that he had left Aetna. He visited one firm three times without invitation, but ''he did not solicit business.'' Estimates for maintenance service were submitted to two firms upon their invitations. His estimates were similar to the contracts which these firms had entered into with Aetna. In one instance, Aetna's contract had been cancelled before any negotiations were begun with West.

Samuel S. Zagel, president of Aetna, testified that West, as Aetna's supervisor, had been advised of the price received for each job and understood the amount of time and material allotted to it. He taught West how to estimate and sell a job, and trained him in the technique of window cleaning. The information given West, he said, was vital to the successful estimation of a contract in such manner as to avoid loss.

West denied that he had received such information and training at Aetna. He testified that, for about 25 years prior to joining Aetna, he had worked as a janitor.

According to Joseph K. Zagel, secretary of Aetna, he told West, as supervisor, the amount received from each client, the costs of servicing the account, and the particular requirements of each customer. West was given official records and also kept personal memoranda concerning the business of the clients. When he left Aetna's employment, he returned the office records but not his personal memoranda.

West stated that he was not given the amount of the charges made to the customers of Aetna, nor the cost of doing the work. However, he was informed of their service requirements. At the time he left Aetna, he returned to it the list of customers which he had been using. While with Aetna, he kept a personal memorandum book containing notations of calls to be made in accordance with Joseph Zagel's instructions. He did not return this book to Aetna. He admitted that, as to two of the Aetna customers whom he contacted after he went into business for himself, he understood the type of service required because of his experience with them and his general background of knowledge regarding the work to be performed. In one instance, he remembered the amount paid by the client.

The evidence shows that approximately 250,000 business establishments in Los Angeles County use janitor service. Aetna has about 200 customers. Maintenance accounts are sold on the open market, being worth about three times the monthly billing. Usually the contracts may be cancelled upon giving a 30- to 60-day notice, and renewals depend upon the ability of the maintenance company. Generally, a cancellation results from a customer's displeasure with the services given. Ordinarily, when a customer cancels a contract, he engages another company or employs janitors. As a result, Aetna and other companies spend much time and money in efforts to maintain good will and eradicate any ill feeling,

even after a contract has been cancelled. Frequently, a customer who has cancelled his contract renews it.

Upon this evidence, the trial court found that West commenced a competing business and solicited and secured the maintenance business of three Aetna customers, whose names, addresses and requirements he learned while employed by Aetna. These acts were intended to, and did, damage Aetna's business. Unless restrained, West would continue to divert Aetna's customers, to its irreparable damage. Other findings are that, notwithstanding his claim of coercion, West voluntarily executed the employment agreement, and later violated its provisions, but the court determined that it was too ambiguous to be enforced.

In accordance with these findings, judgment was entered against West for $1,467. In addition, he was "permanently enjoined and restrained from soliciting, diverting, or taking away, directly or indirectly, any customers of the plaintiff. . . . and . . . from performing janitorial or window cleaning service for any customer of the plaintiff whom defendant has persuaded to terminate his contract with plaintiff. . . ." He also was restrained from divulging any confidential information pertaining to Aetna's customers.

West attacks the evidence as being insufficient to support the findings of solicitation and of damages. There are no trade secrets in the building maintenance business, he asserts, and the record includes no evidence tending to prove that he used any trade secrets. In addition, he claims that the rights and duties of the parties have been determined differently than provided in the employment agreement.

Aetna analyzes the evidence as affording abundant support for the findings and judgment. In particular, it insists that the information which West secured from it constitutes trade secrets.

Neither party has challenged the determination that the employment agreement is too ambiguous to be enforced. Nor does either of them rely upon the contract as governing his rights. The basic question presented by West as ground for reversal of the judgment is whether the court properly granted equitable and monetary relief upon the cause of action for a tort. He argues that the existence of the contract, even though unenforceable, precludes the court from granting more than the stated amount of liquidated damages. However, if the trial court's construction of the contract is correct, as he

concedes, the agreement is void (Civ. Code, § 1598.) It can have no effect upon the rights of the parties.

 In the absence of an enforceable contract containing negative covenants to the contrary, equity will not enjoin a former employee from soliciting business from his former employer's customers, provided his competition is fairly and legally conducted. (*Continental Car-Na-Var Corp.* v. *Moseley,* 24 Cal.2d 104, 110 [148 P.2d 9]; Rest., Agency, Cal. Annot., § 396.) The question, therefore, is whether West was guilty of unfair competition in soliciting Aetna's customers.

Considering the charge of solicitation, in the light most favorable to the findings the most shown by the evidence is that West informed Aetna's clients of the termination of his employment and his plans to go into business for himself. He also eagerly accepted business from Aetna's customers when it was offered to him. There is no evidence whatever of any suggestion to an Aetna customer that it cancel Aetna's contract and give him the business. In one instance, he accepted an invitation to discuss business with a firm having a manufacturing plant and an office building upon the same premises. He submitted contracts to service both of them. Upon learning that Aetna still serviced the office building and the customer was satisfied with the work done there, although not in the plant, he made no further mention of the office building.

 West had the right to advise Aetna's customers that he was severing his business relations with it and engaging in business for himself. (*Continental Car-Na-Var Corp.* v. *Moseley, supra.*) In *Theodore* v. *Williams,* 44 Cal.App. 34, 37 [185 P. 1014], the former employee advertised his new business association by driving a plainly labeled wagon along the laundry route which he had served for his former employer and by inserting announcements in newspapers. The court held that such activity did not violate an injunction against soliciting, either directly or indirectly, any business from customers of his former employer.

 "Solicit" is defined as: "To ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite." (Black's Law Dictionary, 3d ed., p. 1639.) "It implies *personal* petition and importunity addressed to a particular individual to do some particular thing, . . . ." (*Golden & Co.* v. *Justice's Court,* 23 Cal.App. 778, 798 [140 P. 49].) It means: "To appeal to (for something); to apply to for obtaining some-

thing; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore, or importune; to make petition to; to plead for; *to try to obtain."* (*People* v. *Phillips,* 70 Cal.App.2d 449, 453 [160 P.2d 872].)

■ Merely informing customers of one's former employer of a change of employment, without more, is not solicitation.

■ Neither does the willingness to discuss business upon invitation of another party constitute solicitation on the part of the invitee. ■ Equity will not enjoin a former employee from receiving business from the customers of his former employer, even though the circumstances be such that he should be prohibited from soliciting such business. (*Golden State Milk Prod. Co.* v. *Brown,* 217 Cal. 570, 571 [20 P.2d 657]; *New Method Laundry Co.* v. *MacCann,* 174 Cal. 26, 32 [161 P. 990, Ann.Cas. 1918C 1022]; *Foster* v. *Peters,* 47 Cal. App.2d 204, 206 [117 P.2d 726].) West was entitled to accept business from Aetna's former customers and such acceptance, by itself, did not constitute solicitation.

■ However, even in the absence of solicitation, Aetna is entitled to protection against West's use, or disclosure in competition with it, of trade secrets given to him only for the purpose of carrying on his employer's business. (*Reiss* v. *Sanford,* 47 Cal.App.2d 244, 246-247 [117 P.2d 694]; *Germo Mfg. Co.* v. *McClellan,* 107 Cal.App. 532, 541 [290 P. 534]; Lab. Code, § 2860; Rest., Agency, § 396(b); see cases collected in 165 A.L.R. 1453.) West takes the position that there are no trade secrets in the building maintenance business and there is no evidence of his use of a trade secret. Aetna, on the other hand, argues that its customer lists, knowledge of the requirements of various customers, the use of certain procedures, material and equipment, and its cost records are trade secrets. The evidence, it says, was sufficient to support the finding that West secured these secrets as its employee and wrongfully used them in competition with it.

■ The facts of this case do not justify the application of principles governing the rights of the parties in connection with retail delivery routes. Under such circumstances, as stated in *George* v. *Burdusis,* 21 Cal.2d 153, 159 [130 P.2d 399], and other decisions, to obtain relief against a former employee it must be shown: (1) The information was confidential and not readily accessible to competitors; (2) The former employee solicited the customers of his former employer with intent to injure him; (3) The former employee sought

out certain preferred customers whose trade is particularly profitable and whose identities are not generally known to the trade; (4) The business is such that a customer will ordinarily patronize only one concern; (5) The established business relationship between the customer and the former employer would normally continue unless interfered with. (*California Intelligence Bureau* v. *Cunningham*, 83 Cal.App.2d 197, 202 [188 P.2d 303], and cases there cited.)

These factors are here absent. Prospective customers are commonly known to the trade or may easily be discovered through business directories or by observation. (*Avocado Sales Co.* v. *Wyse*, 122 Cal.App. 627, 634 [10 P.2d 485].) There is no evidence that West sought out preferred customers. In any event, the evidence produced by Aetna is to the effect that there are no preferred customers in the trade. Accounts are sold upon the open market at flat rates without regard to either their duration or profitableness. The evidence shows that the business is highly competitive and patronage depends upon efficiency of service rather than personal relationship. Contracts are of brief duration and cancellations are frequent. Under such trade conditions, equity will not enjoin the solicitation of the former employer's customers. (*Continental Car-Na-Var Corp.* v. *Moseley, supra*, p. 111.)

■ Equitable protection may be invoked against the subsequent use by a former employee of knowledge of the "peculiar likes and fancies and other characteristics" of the former employer's customers where such knowledge will aid him in securing and retaining their business. (*George* v. *Burdusis, supra*, p. 160; *Dairy Dale Co.* v. *Azevedo*, 211 Cal. 344, 345 [295 P. 10] ; *Pasadena Ice Co.* v. *Reeder*, 206 Cal. 697, 704 [275 P. 944, 276 P. 995].) This rule applies where friendly contact with customers is important to solicitors, a circumstance typical of the so-called "trade route" cases. It has also been applied to situations involving a knowledge of the customer's desire for specialized information, his preference for certain products, and his buying habits. (*California Intelligence Bureau* v. *Cunningham, supra*, p. 204; *Wallich* v. *Koren*, 80 Cal.App.2d 223, 227 [181 P.2d 682].) However, where, as here, superiority of product or service, rather than personal relationships or a secret specialty, is the basis for patronage, a knowledge of the customer's requirements is not sufficient reason for an injunction. (*Continental Car-Na-Var Corp.* v. *Moseley, supra*, p. 111; *DeLuxe Box Lunch & Catering Co.* v. *Black*, 86 Cal.App.2d 434, 441 [194 P.2d 715].)

Under circumstances of open competition, such knowledge is readily available to all in the trade.

Insofar as methods of janitorial service are concerned, the evidence shows no trade secret. An instructor of building maintenance testified to the standard techniques and procedure which he taught both in the public schools and to Aetna employees. ■■■ "Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." (Rest., Torts, § 757, com. b.) ■■■ No evidence was introduced which tended to prove that Aetna used any unusual or secret material or equipment. On the contrary, the evidence shows that it regularly tested products of general use in the trade to determine which best suited its purposes.

According to Aetna, its procedure for estimating the price of a new contract, was a trade secret. However, no evidence was introduced tending to prove that Aetna had developed a secret, or even improved, system of making estimates. The very most which is shown by the evidence is that Aetna utilized a highly efficient system designed to meet competition and avoid losses. Of necessity, any competitior in the business must consider all of the factors which entered into Aetna's computations. There is a total absence of any showing that the method of making estimates are secret, or that West was informed of any claim of secrecy. Under these conditions, West was privileged to use "methods of doing business and processes which are but skillful variations of general processes known to the particular trade." (Rest., Agency, § 396, com. b.)

The evidence upon the question of whether West had access to Aetna's cost records is conflicting. The trier of fact could have believed that West, during his employment, acquired knowledge of costs of doing business and took it with him. However, assuming, without deciding, that this information was secret, there is no evidence tending to show that he made unfair use of it in competing with Aetna, or intends to do so.

■■■ The evidence clearly shows that the janitorial business does not depend upon patrons whose work can be done at an exceptionally low cost. Under these circumstances, the records in West's possession could have no value to him unless he desired to do janitorial work for less than Aetna's contract prices for the same service. But in the only two transactions shown in evidence where West submitted bids to Aetna's customers, his estimates were higher than the amounts which

Aetna was receiving. He charged five dollars more for identical service in one case. On the other bid, he offered janitorial service only for $13.50 less than Aetna charged for both janitor and window cleaning service. Such evidence is insufficient to support the finding that West used and intended to use Aetna's confidential cost data in unfair competition with it.

The judgment is reversed.

Gibson, C. J., Schauer, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent.

There is sufficient evidence to support the trial court's finding that defendant West obtained from plaintiff trade secrets which he used in soliciting its customers.

In regard to the solicitation, the evidence shows that defendant West advised three customers of plaintiff that he had severed his relation as an employee of plaintiff and had gone into business for himself. Obviously, that statement was made for the purpose of obtaining their patronage at plaintiff's expense. There is ample evidence to justify an inference which the trial court could draw to this effect. There is nothing in *Continental Car-Na-Var Corp.* v. *Moseley,* 24 Cal. 2d 104 [148 P.2d 9], to the contrary. The court there merely said that an ex-employee may send out a form letter that he is engaging in business for himself. That does not mean, that under any circumstances, personally advising the former employer's customers of the severance of his relations and that he is engaging in the same business will not support an inference that he actually asked the customers for their patronage. Here defendant personally so advised the customers and gave them his business card. He made such a call on three occasions on one of the customers. He took proposed contracts to another which were practically identical with those used by plaintiff with which he was familiar. In addition, plaintiff's officers called him on the telephone after he had contacted the customers and charged him with having violated his contract by soliciting its customers. Defendant did not deny the solicitation. He merely replied that he had a right to and was going ahead to make a living. Such a failure to deny solicitation constituted an admission of it by an adoption of the accusatory statement. (Code Civ. Proc., § 1870[3] ; 10 Cal.Jur., 1070 et seq.)

In regard to the nature of the information obtained by defendant in his employment as being a protectible interest, the evidence is adequate to support the finding on this issue. The parties entered into an employment agreement and it was signed by defendant. Although it was void for uncertainty, nevertheless, it contained statements that constituted admissions by defendant. It is recited therein that the parties acknowledged that the ''good will, continued patronage and the list of names and addresses of its customers and their special requirements constitute the principal asset of the Company.'' Further that defendant in his employment ''has·become or will become acquainted with many of the said customers, their names, addresses, and special requirements, and will become acquainted with other and future customers and with the other confidential matters of the Company's business.'' In addition to that the evidence shows that plaintiff's contracts or accounts with its customers were not for merely one order or successive independent orders. They ran for a period of time. The character of the service was such that a customer would not be contracting with more than one supplier at the same time, as he might well do if only the purchase of supplies or products for resale were involved. The accounts had a definite marketable value which was in excess of the amount called for on the face of the contract, the increased value being predicated on the prospects of renewal contracts in the future. Defendant was a supervisor for plaintiff, and in that capacity, he obtained the lists of customers, made personal contact with them, considered their complaints concerning· the service and endeavored to eliminate the cause for complaint. He learned from plaintiff the exact method of computing the cost of furnishing the service and the *actual cost* of jobs he later solicited, and the peculiarities and special requirements of the various customers. These factors bring the case squarely within the rule that customer lists are protected even though they may be obtainable where each customer may be differentiated from the other in the nature of his requirements and the value of his patronage to the former employer. The rule is thus stated: ''There is no merit in this assertion (that the customer lists were not secret), since obviously it is not merely the knowledge of the identity of the customers, but the friendly contact with them which is important to the solicitors: '. . . they became personally acquainted with the customers of the respondent, their respective places of residence, their peculiar likes and

fancies and other characteristcs, a knowledge of which would greatly aid them in securing and retaining the business of said former customers.' " (*Dairy Dale Co.* v. *Azevedo,* 211 Cal. 344, 345 [295 P. 10].) In *Scavengers P. Assn.* v. *Serv-U-Garbage Co.,* 218 Cal. 568 [24 P.2d 489], the issue was whether a former employee of a corporation engaged in the garbage collection business could be prevented from soliciting customers of his former employer. This court held that he could, stressing the fact that some of the customers. were preferred because they discarded material that could be salvaged and sold as junk. This is similar to the nature of the conditions, the premises of the persons desiring janitorial service, varying with each customer. As in that case, the case at bar involves customers who could be found from directories, as nearly everyone had garbage disposal service, but each customer had his peculiarities.

The trial court had adequate justification for concluding that defendant employee had acquired the names of his employer's customers, the particular needs of each, what each complained of in respect to the service supplied by plaintiff, the idiosyncrasies of each, the particular needs for each job and the itemized cost thereof from actual experience while in the employ of plaintiff. Clearly the trier of fact could infer that pleasing a person with cleaning service depends largely upon the person's personal opinion and taste of what constitutes a satisfactory job. By his contacts, and as the recipient of complaints, defendant was in a position peculiarly adapted to gaining such information. Assuming, as does the majority, that the quality of the service was a major factor in obtaining and keeping accounts, yet the holder of the yardstick is the person to whom the service is furnished and whose opinion may vary from other persons and each of the latter may vary as to each other. Defendant acquired that knowledge in the course of his employment and information which was more than a part of his learning of the work generally. Having acquired that knowledge and information while in the employ of plaintiff, he sought to apply it to plaintiff's detriment by inducing plaintiff's customers to forsake plaintiff and employ him to do that which plaintiff had apparently been doing to the mutual benefit and satisfaction of plaintiff and its customers before defendant interfered.

I am in full accord with the views expressed in the opinion prepared by Mr. Presiding Justice Moore and concurred in by Mr. Justice McComb when this case was before the District

Court of Appeal, Second Appellate District, Division Two, (Cal.App.) 236 P.2d 390.

I would, therefore, affirm the judgment.

Shenk, J., concurred.

Respondent's petition for a rehearing was denied July 31, 1952. Shenk, J., was of the opinion that the petition should be granted.