[Civ. No. 46999. First Dist., Div. Three. Feb. 9, 1982.]

RIGGING INTERNATIONAL MAINTENANCE COMPANY,
Plaintiff and Appellant, v.
STEVE W. GWIN, Defendant and Respondent.

COUNSEL

Ernest H. McCoy, Burton Danziger and Bruce & McCoy for Plaintiff and Appellant.

Siegfried Hesse, Robert P. Brorby, Dodge, Reyes, Brorby, Randall & Titmus, Julius Kahn III, Robert W. Dilts and Phillips, Moore, Weissenberger, Lempio & Majestic for Defendant and Respondent.

OPINION

**WHITE, P. J.**—Plaintiff and appellant Rigging International Maintenance Company, a wholly owned subsidiary of Rigging International, caused a complaint to be filed in the Superior Court of Alameda County on March 3, 1978, alleging that defendant and respondent Steve W. Gwin had wrongfully interfered with its business relationships (first cause of action), engaged in unfair competition and breached a confidential information agreement (second cause of action). In the complaint appellant sought an injunction, damages (first and second causes of action) and specific performance of the confidential information agreement (third cause of action).[1]

Appellant obtained a temporary restraining order and a preliminary injunction. The trial in the instant action commenced on May 15, 1978, before the Honorable Lyle E. Cook, sitting without a jury. At the conclusion of appellant's presentation of evidence, respondent moved for judgment pursuant to Code of Civil Procedure section 631.8. The motion was granted as to the first cause of action and denied as to the second and third causes of action. At the conclusion of the trial, the court found for respondent on the second and third causes of action. After findings of fact and conclusions of law were filed, judgment was entered in favor of respondent.[2] Appellant's motion for a new trial was denied. Appellant filed a timely notice of appeal from the judgment.

---

[1]During trial, the fourth and fifth causes of action alleged in the complaint were dismissed on appellant's motion.

[2]The preliminary injunction that had been granted prior to trial was "dissolved as of May 22, 1978."

Appellant contends on appeal that (1) the "conclusions" of the trial court that respondent did not unfairly compete with appellant is contrary to the governing law and is unsupported by the findings or evidence; (2) the trial court's "conclusion" that appellant had "no trade secret or confidential information relating to a twist-lock interlock system" is not supported by the findings, the evidence or the law; and (3) the confidential information agreement is enforceable against respondent.

The issues in this case revolve around (1) appellant's negotiations with Marine Terminals Company (hereafter MTC), a stevedoring company, concerning a proposed contract whereby appellant would do the maintenance work on four cranes of MTC located at MTC's Oakland terminal; (2) the establishment by respondent, a former employee of appellant, of a crane maintenance company, which company entered into negotiations with MTC for the maintenance work on MTC's four cranes; and (3) the development of "improvements" for a cargo container lifting apparatus.

Appellant, a wholly owned subsidiary of Rigging International, is primarily in the business of providing repair and maintenance services for "container cranes on the docks that handle containers for shipping companies." In July of 1974, appellant hired respondent in the capacity of a crane mechanic, but within a few weeks appellant promoted respondent to the position of maintenance superintendent. Prior to his employment with appellant, respondent had worked for MTC. Respondent worked for MTC for 10 years, starting in 1964 as a journeyman mechanic. In 1969 or 1970 three container cranes were installed in MTC's Oakland facility. Since, at that time, there were no container crane mechanics, MTC asked General Electric to "'put together some type of a maintenance training program for this system.'" Thereafter, respondent attended three training courses devised by General Electric. At the time respondent terminated his employment with MTC he was the foreman "in charge of all rolling stock, crane maintenance operation for Marine Terminals in the East Bay facilities." Respondent testified that when he left MTC in 1974, he intended "to enter into a business venture with two other individuals to perform container crane maintenance with Sea-Land Corporation ... in New Orleans." The venture did not materialize. Shortly thereafter respondent was approached by an employee of

Rigging International because of respondent's familiarity with container cranes. Rigging International hired respondent for employment with appellant.

In February of 1977, appellant was contacted by MTC and asked to make a proposal to take over the maintenance work for MTC's four cranes located at MTC's facility in the Port of Oakland, which maintenance work was then being performed by MTC's own mechanics. In May of 1977, negotiations broke down because of problems related to the effect of the proposed contract on the union maintenance men at MTC. Prior to the time the negotiations broke down, respondent helped estimate the number of man hours necessary to perform the work for MTC. Appellant then submitted a proposed contract to MTC. The proposed contract that appellant submitted to MTC was taken from past contracts with other clients, although the proposed contract was reworded and rephrased to suit the situation for the MTC cranes. Negotiations were resumed in August or September of 1977.

The renewed negotiations did not go smoothly. MTC wanted substantial changes made in the proposed contract. There were at least six to ten drafts prepared between September and the middle of December of 1977, as the proposed contract grew from five to fourteen pages in length. Particularly difficult to resolve were the terms relating to liability insurance and indemnification.[3] On December 14, 1977, appellant informed MTC that appellant would agree to the insurance coverage and terminology MTC wanted in the contract. Darold Hedlund, president of appellant and general manager for the west coast district of Rigging International, testified that at least by December 14, 1977, "we thought that we had an understanding." Appellant made the "agreed" upon changes and on December 14, 1977, the proposed agreement was forwarded to MTC for the signature of the president of MTC who was out of town and was not due to return until January 2 or 3, 1978. Raymond Barker, manager of appellant, testified that on that same day he told respondent that appellant had agreed to all of the terms demanded by MTC. However, in late December MTC raised further objections and advised appellant that the proposed contract did not reflect its un-

---

[3]Respondent only attended two of the many meetings between appellant and MTC that were held for the purpose of reaching an agreement satisfactory to both sides.

derstanding of the parties' verbal agreement. MTC further informed appellant at this time that MTC was going to seek other bids.

On April 18, 1977, respondent signed a document entitled "Employee Confidential Information and Invention Assignment Agreement" (hereafter referred to as Agreement). The Agreement purports to be between Rigging International and respondent.[4] The Agreement provides in part: "As used herein, the term 'RIGGING INTERNATIONAL' shall include all of its subsidiaries and affiliated companies and joint ventures." The terms "confidential information" and "invention" are defined in and for the purpose of the Agreement. With regard to confidential information the Agreement specifies in part: "EMPLOYEE shall not disclose RIGGING INTERNATIONAL'S trade secrets, proprietary know-how, or confidential information, directly or indirectly, or use for EMPLOYEE'S own benefit or purposes such information in any way, either during the term of this agreement or at any time thereafter, except as required in the course of EMPLOYEE'S employment by RIGGING INTERNATIONAL. . . . This provision shall not apply to information that has been voluntarily disclosed to the public, or independently developed and disclosed by others, or otherwise enters the public domain through lawful means." With regard to inventions, which the Agreement defines as including improvements, the Agreement provides in part: "Any improvements or inventions made by EMPLOYEE, either alone or with others, at any time during EMPLOYEE'S employment by RIGGING INTERNATIONAL, whether during or after usual working hours, or made thereafter as a result of any invention made or conceived during EMPLOYEE'S employment, so far as said improvements or inventions relate to RIGGING INTERNATIONAL'S business, procedures, and developments, shall be held for the benefit and become the sole and exclusive property of RIGGING INTERNATIONAL and EMPLOYEE shall not disclose or use said inventions, except as required hereunder or as required in the course of his/her employment by RIGGING INTERNATIONAL, without the prior written consent of RIGGING INTERNATIONAL."

Respondent testified that the Agreement was in his "in-basket" one day. Respondent stated he "didn't feel that" the Agreement "pertained to" appellant "or to myself," because he was an employee of appellant not Rigging International. He "didn't give it a lot of concern." However, respondent signed the document without any objection.

---

[4]Although the Agreement contains a signature line for the president of Rigging International, the Agreement was never signed by a representative of Rigging International.

In November of 1977, respondent formed a corporation called Crane Maintenance Engineering, Inc. Respondent is the sole owner of the corporation.[5] Respondent tendered his resignation to appellant on December 15, 1977. Respondent testified that he told Hedlund "I was leaving to accept a position in my family's firm."

Respondent testified that he first indicated to MTC that he was interested "in putting in a proposal" in the "mid-part of January 1978." Respondent submitted one proposal around the middle of January and a second one in the latter part of January. MTC informed respondent that his proposals were not comprehensive enough and gave him a copy of a contract that had been prepared by MTC's attorney to use as a model. Respondent admitted that in preparing his first two proposals, he used portions of some of the earlier proposals that appellant had submitted to MTC. However, most of the language of appellant's earlier proposals is commonly found in contracts generally used in the industry. In fact, appellant had developed some of the forms it used to prepare its proposals by looking at forms used by other companies in the industry. Furthermore, some of the forms used by appellant to prepare its proposals could easily be duplicated by any trained crane mechanic. At the time of trial, neither appellant nor respondent had been awarded the contract with MTC, although it had been "tendered" to respondent.[6]

There is a vast difference in the testimonies given by respondent and the representatives of appellant describing the circumstances surrounding the development and improvement of a twist-lock interlock system for lifting shipping containers. The twist lock is a safety device. Appellant describes the safety device as follows: "The safety device consisted of electrical sensors to be placed on each of the four corners of a crane's lifting spreader to indicate when the twist locks on the spreader were in position to be properly engaged with each of the four corners of the shipping container to be lifted." The improvements to the safety device that appellant claims that respondent participated in developing during the course of his employment with appellant were to add a time delay

---

[5]At trial the parties did not treat respondent and the corporation he formed as separate entities (nor do they do so in their briefs on appeal). Following the example of appellant and respondent, we will also ignore the technical distinction between respondent and the corporation he formed.

[6]Under the temporary restraining order and preliminary injunction that appellant had obtained prior to trial, respondent was "enjoined" from entering into a maintenance contract with MTC.

to the safety device and to wire the sensors in parallel instead of in series.[7]

Respondent gave the following version of the circumstances surrounding his participation in the development of improvements to the twist-lock interlock system: Before his employment with appellant he was well aware of inadequacies of the interlock systems that were then being used in the industry. By 1976, respondent had an idea for a device using the sensors with a parallel circuitry. Respondent had been "playing around" with noncontact sensors since 1975 or 1976, because a magnetic sensor would not work well on "an aluminum or a non-ferrous corner casting." In April of 1977, respondent approached Hedlund, president of appellant, and told him he had "a real slick idea . . . for a twist-lock control." Respondent revealed "a little bit about" his idea, but he did not discuss the circuitry. Hedlund informed respondent that appellant was not "in the business of manufacturing, that [appellant was] in the business of selling a service." Shortly thereafter, respondent made a "marketing type drawing" and showed it to Hedlund in the presence of Raymond Barker, manager of appellant, but received the same type of response from Hedlund. When Hedlund rejected the proposal because it was not in appellant's line of business, respondent decided he would go "ahead to complete the project on my own." While on vacation in August of 1977, respondent worked on the twist-lock control system and put together what he "thought was a very workable product," but then concluded it needed a parallel resistor to compensate for the "bleed rate" in the parallel circuitry. Respondent "figured out" that his system needed "parallel resistance" as a result of a conversation he had with a friend, who was an electrical design engineer. This conversation also occurred during his vacation in August of 1977.

In September of 1977, Larry Nelson of the Charles Lowe Company came to appellant's offices and demonstrated a safety device for lifting containers (the Lowe twist lock) that the Charles Lowe Company was "getting ready to produce . . . ." Respondent attended this demonstra-

---

[7]Respondent describes the differences between series and parallel circuits as follows: "For example, series and parallel Christmas tree lights both operate at the same normal household voltage. But, when a bulb burns out in a series string of lights, the current, which flows through all of the bulbs, is interrupted, whereas the currents flow through each of the bulbs of a parallel string of lights completely independently of each other. . . . [W]ith a series string of bulbs, all go out when one does, but with a parallel string of lights, the other bulbs continue to burn."

tion.[8] The purpose of the demonstration was to interest appellant in the distribution and marketing of the device. The device demonstrated operated without a time delay and the sensors were wired in series. Barker thought that appellant should "make" its own device rather than market the Lowe twist lock. At this point respondent said, "'I've been telling you about this before.'" Don Simmons, a foreman with appellant, also attended the demonstration and suggested that the Lowe system could be improved by adding a time delay to the electrical system. Respondent stated that Simmons suggested the addition of a time delay to the Lowe system, "[b]ecause this is something we had talked about prior."

Shortly after the demonstration, Hedlund suggested to respondent that he go back to Sea-Land and "'snoop around'" to learn more about the system with which Sea-Land was experimenting. When respondent reported to Hedlund to tell him what he had found out at Sea-Land, Hedlund inquired, "'Well, whatever happened to the idea you were working on? Didn't you have an idea like this?'" Respondent replied, "'Yes, I did, and I thought it was a better idea.'" Thereafter Hedlund told respondent and Barker to try to develop a twist lock to market.

Respondent went to a company he knew called Steven Engineering in South San Francisco with Barker to purchase the parts to build a model of a modified Lowe system. Ken Walter, President of Steven Engineering, could not locate the type of sensors that respondent requested. Walter asked respondent, "'Can you make the circuits in parallel.'" Respondent replied he "had been planning" on such a system and then drew a sketch of the system using parallel sensors. When respondent returned to Steven Engineering, Walter showed respondent his drawing which Walter had modified to accommodate the parts Walter had available. Respondent was of the opinion that the system would not be dependable, without a parallel resistor.

Respondent ordered the parts to build a model of the system in November of 1977, but he terminated his employment with appellant shortly thereafter (in December of 1977) and never built a model. Respondent returned the parts to appellant. In January of 1978 respondent perfected his system. Respondent's system included a time delay and the sensors were wired in parallel, but his system also included a parallel resistor. Respondent sold a twist-lock interlock system to MTC. At

[8]Respondent had looked at an experimental twist-lock system that was being used by a company called Sea-Land Services in 1976 at the request of Hedlund. Respondent learned after the demonstration in September of 1977 that the system he had been shown at Sea-Land in 1976 was also a Lowe device.

the time of trial, appellant had managed to build only a small model of a twist-lock interlock device, which malfunctioned for some five minutes during Barker's deposition.

On the other hand, witnesses called by appellant gave the following accounts of the circumstances surrounding the development of improvements to the Lowe twist-lock system: Hedlund asked respondent in "mid-'76" to look at an experimental twist-lock system that was being used by Sea-Land Services. Hedlund's purpose in requesting that respondent look at the system being used by Sea-Land was to learn what the system "did and if it was worthwhile having." The report that respondent gave Hedlund after he had seen the system at Sea-Land "was vague." Hedlund told respondent to obtain more information about the system being used at Sea-Land, but respondent did not mention the subject of a twist-lock system to him again until after the demonstration that was given by Larry Nelson of the Charles Lowe Company at appellant's offices in September of 1977. Donald Simmons, a foreman for appellant, stated that after the demonstration he suggested that the Lowe system could be improved by adding a "[t]ime delay relay." Simmons further stated that he never had discussed with respondent before this time "any type of system similar to the Charles Lowe device . . . ." Raymond Barker testified that Ken Walter was the first person to suggest that the sensors should be wired in parallel.

Hedlund testified that after it was decided that the Lowe system could be improved by adding a time delay and wiring the sensors in parallel, he had a discussion with Barker and respondent regarding a method by which appellant could keep others from finding "out exactly how our system worked." Hedlund stated that respondent "came up with the idea" that the circuit box for the operation of the electric circuitry be filled with foam.

### Unfair Competition

Appellant contends on appeal that the conclusions of the trial court that respondent did not unfairly compete with appellant is contrary to the governing law and is unsupported by the findings or evidence. In its closing brief appellant summarizes its position as follows: "All that appellant claims in this appeal is that [respondent] was barred from competing with [appellant], by soliciting MTC for the contracts under negotiation with [appellant], for a reasonable period of time after he terminated his employment at [appellant] and that in any competition

with [appellant] for the MTC contract, he was barred from using confidential information obtained through his employment related to the specific terms, amount, and status of the [appellant's] negotiations with MTC. Although appellant did urge during the trial that the [respondent] was also barred from using the 'trade secret' information related to the general forms, formulas, and methods of doing business (as distinguished from the specific information related to the particular contract negotiations), it *does not* raise any issues related to the trial court's rulings on these general business methods in its appeal. [¶] ... With regard to the facts, appellant urges that under proper legal standards, the evidence conclusively established that [respondent] had competed unfairly in the manner complained of (i.e., solicited the contract and possessed and used confidential information in doing so)."

■ "A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted." (*Continental Car-Na-Var Corp.* v. *Moseley* (1944) 24 Cal.2d 104, 110 [148 P.2d 9]; *Cal Francisco Inv. Corp.* v. *Vrionis* (1971) 14 Cal.App.3d 318, 323 [92 Cal.Rptr. 201].) A former employee's use of confidential information obtained from his former employer to compete with his old employer and to solicit the business of his former employer's customers, is regarded as unfair competition. (*Greenly* v. *Cooper* (1978) 77 Cal.App.3d 382, 391-392 [143 Cal.Rptr. 514]; 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 87, p. 5309.)

■ "'A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.' [Citations.] Although the nature of a trade secret is somewhat nebulous, a characteristic common to those secrets which have found protection from disclosure and use by the courts is the need for their continued use by the former employer in order to maintain a competitive advantage over others." (*Cal Francisco Inv. Corp.* v. *Vrionis, supra*, 14 Cal.App.3d 318, 322.) Most trade secret litigation deals with a former employee's use of a list of customers of his former employer. (7 Witkin, Summary of Cal. Law, *supra*, Equity, § 85, p. 5307.) "The cases on other trade secrets are fewer, and the principles are more difficult to apply. An employee's skill and knowledge of a particular business constitute the means by which he earns a

living, and the courts should not hastily brand them as confidential where this will deprive him of employment opportunities." (*Id.*, § 88, p. 5310; see also *Aetna Bldg. Maintenance Co.* v. *West* (1952) 39 Cal.2d 198, 206 [246 P.2d 11]; *Futurecraft Corp.* v. *Clary Corp.* (1962) 205 Cal.App.2d 279, 288 [23 Cal.Rptr. 198].)

Appellant cites *Fidelity etc. Co.* v. *Federal etc. Co.* (1933) 217 Cal. 307 [18 P.2d 950], for the proposition that a former employee may be found to be engaging in unfair competition even if the employee does not use any confidential information of his former employer. In *Fidelity*, the California Supreme Court stated: "We are in accord with the court on the proposition that if the defendants, or either of them, were carrying on uncompleted negotiations with prospective patrons on behalf of plaintiff at the time that Mr. Froelich and Mr. Bowater left the employ of plaintiff, or if negotiations were pending at said time, it would not be fair or equitable to permit them to reopen business negotiations with said prospective patrons on behalf of defendant corporation until a reasonable time thereafter should have elapsed." (*Id.*, at p. 315.) The quoted comments by the California Supreme Court do not support appellant's position as the comments pertain to methods or acts which may be denounced as unfair competition on the part of *business rivals* and do not pertain to a determination "whether an employee should be permitted to solicit the patrons of his former employer." (*Id.*, at p. 314.) To better illustrate the distinction the California Supreme Court was making in *Fidelity,* it is necessary to quote further from that decision: "*It is difficult indeed to draw the line between methods or acts which may be denounced as conspiracies to acquire the business or a part of the business of competitors, and those which may be considered legitimate acts- or methods of competition.* No fixed standard or code of business ethics has been adopted by the business world limiting or defining the extent to which business rivals may go in the employment of artifice, cunning or what are known as the 'tricks of the trade' or business craft in drawing trade from one to another. Ingenuity, business thrift and alertness are a part of the capital stock of those engaged in rival businesses. *So also it is difficult in many cases for the law to determine whether an employee should be permitted to solicit the patrons of his former employer. In the first case, it is only when the methods or acts of a business rival are clearly and manifestly unfair, and in the second case, only where the employee is in the possession of secret information not readily accessible to others and acquired by reason of his employment, that courts will afford injunctive relief.*" (*Id.*, at p. 314, italics added.)

Accordingly, *Fidelity* does not stand for the proposition that a former employee may be found to be engaging in unfair competition every time he solicits a prospective client or customer of his former employer, if his former employer was negotiating with the prospective client during the time the former employee was employed by his former employer, even if the employee does not use any confidential information of his former employer. The determination of legitimate acts or methods of competition for business rivals is separate and apart from the determination of proper acts of competition by a former employee, although a business rival may also be a former employee. In order for the methods of a business rival to be denounced as unfair, the methods must be of an "extraordinary character" and whether the methods of a business rival are of "that extraordinary character" is a "question primarily for the trial court to determine, and this court will not disturb its findings unless they are entirely unsupported by the evidence." (*Id.*, at p. 314.) The California Supreme Court in *Fidelity* found that the trial court's findings that defendants employed unfair methods of competition against plaintiff were supported by substantial evidence, stating: "While it is true that the alleged specific acts constituting unfairness were but few, and the evidence offered to sustain them was susceptible of two constructions, the court found against appellants and we are bound by its findings. There is evidence, conflicting it is true, that Mr. Froelich did solicit, after he had severed his connections with plaintiff, certain customers with whom he had negotiated as agent for plaintiff while an employee of said plaintiff. The court further found that the information which Froelich acquired by reason of his employment by plaintiff was of that confidential character which an employee is not permitted to turn to his own advantage." (*Id.*, at p. 315.) It is not altogether clear that the court in *Fidelity* found the methods adopted by the defendants were of the character that courts will afford injunctive relief without a finding that the individual or individuals used or possessed confidential information. This ambiguity is more clearly displayed in the California Supreme Court's discussion of the judgment entered in the trial court, wherein the court stated: "We do not understand the decree means to forever enjoin the defendants from soliciting business from persons who were the former patrons of plaintiffs, but merely enjoins them from taking advantage of any secret information the defendants, as former employees, may have gained by reason of their employment. This injunction applies to the solicitation of persons with whom negotiations with plaintiff were pending or with prospective patrons specifically identified at the time defendants left the employ of plaintiff." (*Id.*, at p. 318.) For the purposes of resolving the issues raised in this appeal, it is

unnecessary to determine, and we have not determined, whether the methods adopted by the defendants in *Fidelity* were of the extraordinary character that courts will afford injunctive relief without a finding that the defendants used or possessed confidential information. We will assume, only for the sake of argument, that *Fidelity* does not require a finding that the defendants used or possessed confidential information.

The trial court in the instant case concluded that respondent "did not unfairly compete with" appellant. Specifically, the trial court found: "9. Prior to [respondent's] employment by [appellant], [respondent] had been employed by [MTC] in the crane maintenance industry for approximately 10 years. [¶] 10. [Appellant] failed to establish that the methods, procedures, systems and specialized techniques used by [appellant] in selling and performing its services were confidential and not readily accessible to competitors. [¶] 11. [Appellant's] methods, procedures and systems are matters of general knowledge in the industry, and the specialized techniques are but skillful variations of the general processes known to the particular trade. [¶] 12. [Appellant] failed to establish [respondent] used any knowledge or information obtained from [appellant] not readily accessible to the trade.... [¶] 18. [Appellant] failed to establish that [respondent] interfered with [appellant's] negotiations with [MTC]."

■ The trial court's conclusion in the instant case that respondent "did not unfairly compete with" appellant is supported by substantial evidence. In other words, the California Supreme Court's decision in *Fidelity etc. Co.* v. *Federal etc. Co., supra,* 217 Cal. 307, does not compel or permit this court to disturb the conclusion reached by the trial court in the instant case; even though we have assumed for the purposes of this appeal, that the methods adopted by the defendants in *Fidelity* were of the extraordinary character that courts will afford injunctive relief without a finding that the defendants used or possessed confidential information. In *Fidelity,* it appears that the prospective clients' only contact with plaintiff was through defendants, when defendants were acting as the agents for plaintiff in negotiating with the prospective clients. Similarly, in *Fidelity,* defendants only became acquainted with the prospective clients of plaintiff because of their association with plaintiff. A different fact situation is presented in the instant case. Respondent was well acquainted with MTC before his employment with appellant. Respondent had been an employee of MTC for 10 years before his employment with appellant. Although respondent was informed of the

progress appellant was making with MTC in appellant's negotiations with MTC and had helped estimate the cost of performing the work for MTC, respondent was not part of appellant's negotiating team. In contrast to *Fidelity*, respondent's minimal connection with the negotiations between appellant and MTC, did not enhance any personal relationship between respondent and any representative of MTC nor particularly facilitate respondent's acquisition of any knowledge about MTC. (See *Aetna Bldg. Maintenance Co.* v. *West, supra*, 39 Cal.2d 198, 205; *George* v. *Burdusis* (1942) 21 Cal.2d 153, 161 [130 P.2d 399].)

Respondent tendered his resignation to appellant on December 15, 1977. Respondent continued working for appellant until December 20, 1977. Around December 28 or 29, 1977, MTC informed appellant that it was not pleased with the way the negotiations were going and that MTC was going to seek other bids. Respondent testified that he first indicated to MTC that he was interested "in putting in a proposal" in the "mid-part of January 1978." There is nothing in *Fidelity etc. Co.* v. *Federal etc. Co., supra*, 217 Cal. 307, which indicates that, as a matter of law, solicitation by a former employee of a prospective client or customer of his former employer, after the prospective client has indicated its dissatisfaction with the progress of the negotiation with the former employer and indicated that it was going to seek other bids, is an unfair method of competition for which courts will afford injunctive relief without a finding that the former employee used or possessed confidential information.

There is evidence in the instant case that respondent had only minimal connection with the negotiations with MTC while respondent was in the employ of appellant and that respondent did not solicit the business of MTC until after MTC stated it was going to seek other bids. The fact situation presented in the instant case is clearly distinguishable from *Fidelity*. Even given the assumption we have made for the purpose of this appeal, *Fidelity* does not compel or permit this court to disturb the conclusion reached by the trial court in the instant case.

As noted earlier appellant also contends on appeal that the conclusion of the trial court that respondent did not unfairly compete with appellant cannot be sustained, because the evidence establishes that respondent used confidential information obtained through his employment with appellant in order to compete with appellant and to solicit the business of MTC. Appellant claims that the confidential information that respondent used related to the specific terms, amount, and

status of appellant's negotiations with MTC. Respondent asserts on the other hand that he made use of no confidential information in which appellant had a genuine proprietary interest. Respondent further asserts that if he used any information obtained during his employment with appellant, the information was not helpful. In support of this latter assertion, respondent points out that MTC was not satisfied with his first two proposals and thereafter gave him a contract prepared by an attorney of MTC to use as a model. Appellant dismisses respondent's assertions in the following manner: "Even if MTC was not satisfied with the submission and submitted a counter proposal, it does not follow that [respondent] did not use information that he had obtained from his employment. Finally, and most importantly, [appellant] submitted conclusive evidence that after he terminated his employment, [respondent] calculated the difference between [appellant's] monthly fixed fee figure that was independent of cost ($6,750), and his own fixed fee figure ($5,625.31), demonstrating that his figure was $1,124.69 per month less than [appellant's]."

Appellant was well advised to abandon its argument that its methods for making a proposal to a prospective client were a trade secret. A similar argument was considered by the California Supreme Court in *Aetna Bldg. Maintenance Co. v. West, supra*, 39 Cal.2d 198, 206, and rejected. In rejecting this argument the California Supreme Court stated: "According to Aetna, its procedure for estimating the price of a new contract, was a trade secret. However, no evidence was introduced tending to prove that Aetna had developed a secret, or even improved, system of making estimates. The very most which is shown by the evidence is that Aetna utilized a highly efficient system designed to meet competition and avoid losses. Of necessity, any competitor in the business must consider all of the factors which entered into Aetna's computations. There is a total absence of any showing that the method of making estimates are secret, or that West was informed of any claim of secrecy. Under these conditions, West was privileged to use 'methods of doing business and processes which are but skillful variations of general processes known to the particular trade.'" (*Id.*, at p. 206.) The California Supreme Court in *Aetna* made a distinction between the procedure for estimating the price of a new contract and the actual figures that were derived by the use of the procedure. However, the court in *Aetna* did not decide whether the use of actual figures which the former employer determined was its cost in doing business with the prospective client, by a former employee, was unfair competition. In this regard, the

California Supreme Court stated: "The evidence upon the question of whether West had access to Aetna's cost records is conflicting. The trier of fact could have believed that West, during this employment, acquired knowledge of costs of doing business and took it with him. However, assuming, without deciding, that this information was secret, there is no evidence tending to show that he made unfair use of it in competing with Aetna, or intends to do so." (*Id.*, at p. 206.)

There is sufficient evidence present in the instant case which would support a finding that respondent did not make unfair use of any confidential information in competing with appellant. There is substantial evidence that, whatever respondent's knowledge of appellant's costs of performing the work for MTC, he did not make unfair use of that knowledge. Respondent figured his costs using different methods than those employed by appellant. The methods used by a respondent were based upon his own extensive experience in the field. As noted earlier an "employee's skill and knowledge of a particular business constitute the means by which he earns a living, and the courts should not hastily brand them as confidential where this will deprive him of employment opportunities." (7 Witkin, Summary of Cal. law, *supra*, Equity, § 88, p. 5310.)

Appellant also contends that the trial court erroneously found that appellant "failed to produce evidence that [respondent] solicited [MTC]." Appellant asserts that respondent admitted that he solicited MTC in respondent's answer and that the trial court was bound by this admission. There is no need to address this contention, because even if this finding is erroneous, reversal of the judgment in the instant case is not required. We have concluded above that respondent did not use any confidential information obtained from appellant to gain an advantage over appellant. "If no confidential information is used, a former employee is free to compete with his old employer, to advise customers of the old employer of his new activities, and to solicit their business." (7 Witkin, Summary of Cal. Law, *supra*, Equity, § 87, p. 5309.)

*Twist-lock Interlock System*

Appellant contends that the improvements (time delay and parallel wiring) made to the twist-lock interlock system were trade secrets and that respondent learned of these trade secrets during the course of his employment with appellant.

We agree with appellant that such improvements could be classified as trade secrets. ■ "The cases emphasize that although a trade secret may be a device or process which is patentable, patentability is not a condition precedent to the classification of a trade secret. Thus, it has been said that a trade secret may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement on a machine or device. Novelty and invention are not requisite for a trade secret as they are for patentability [citation]. In harmony with these precepts, it has been held that a trade secret in the broad sense consists of any unpatented idea which may be used for industrial and commercial purposes [citation]." (*Sinclair* v. *Aquarius Electronics, Inc.* (1974) 42 Cal.App.3d 216, 222 [116 Cal.Rptr. 654].) However, a "basis for the protection of trade secrets is that the recipient obtains through a confidential relationship something he did not previously know." (*Futurecraft Corp.* v. *Clary Corp., supra,* 205 Cal.App.2d 279, 288.) An employee is said to have acquired information amounting to a trade secret from his employer if the information is acquired during the *course* of his employment. (*Ungar Electric Tools, Inc.* v. *Sid Ungar Co., Inc.* (1961) 192 Cal.App.2d 398, 403 [13 Cal.Rptr. 268].)

■ The trial court found in the instant case that respondent "had knowledge of the basic principles involved in a twist-lock interlock system prior to his employment by [appellant]." The trial court further found that respondent "did not acquire any knowledge from [appellant] relating to a twist-lock interlock system." These findings support the conclusion that appellant did not have trade secrets in the improvements made to the twist-lock interlock system that were entitled to legal protection. These findings are also supported by substantial evidence. The testimony of one witness will support a finding of fact. (Evid. Code, § 411.)

Respondent gave the following testimony which supports the above findings and conclusion of the trial court: Prior to his employment with appellant, respondent was well aware of inadequacies of the interlock systems that were then being used in the industry. Twice in 1977 respondent approached the president of appellant regarding possible improvements that could be made to the twist-lock interlock system. On both occasions respondent was informed that appellant was not in the business of manufacturing, but in performing a service. Given the response that respondent received from the president of appellant he decided he would go "ahead to complete the project on my own." While

on vacation in August of 1977, respondent worked on the twist-lock interlock system and put together what he "thought was a very workable product." After respondent terminated his employment with appellant he perfected his system. Thereafter, respondent sold a twist-lock interlock system to MTC. On the other hand, appellant had managed to build only a small model of a twist-lock system by the time of trial, which model malfunctioned for some five minutes during the deposition of the manager of appellant.

This evidence supports a finding that respondent did not acquire the information or make the improvements to the twist-lock interlock system during the *course* of his employment with appellant. Respondent's employment with appellant did not originally encompass the performance of services of an inventive nature. Respondent developed a "workable product" before appellant became interested in developing its own interlock system. Under such circumstances appellant is not entitled to the improvements or to have them classified as appellant's trade secrets. (*Banner Metals, Inc.* v. *Lockwood* (1960) 178 Cal.App.2d 643, 654 [3 Cal.Rptr. 421]; see also *Daniel Orifice Fitting Co.* v. *Whalen* (1962) 198 Cal.App.2d 791, 797-798 [18 Cal.Rptr. 659].)

### Agreement

Appellant contends that the "Employee Confidential Information and Invention Assignment Agreement" is enforceable against respondent. However, appellant agrees with respondent that Business and Professions Code section 16600 precludes enforceability of the agreement signed by respondent "beyond the protection of confidential information . . . ." Since we have determined that respondent did not make use of any confidential information of appellant that was entitled to protection, the agreement does not provide appellant with any additional basis upon which to attack the judgment of the trial court.

The judgment is affirmed.

Feinberg, J., and Stern, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.